**NATIONAL LABOR RELATIONS BOARD v. S. S. COACHMAN & SONS, Inc.**

**No. 14294.**

United States Court of Appeals, Fifth Circuit.

April 2, 1953.

Elizabeth W. Weston, Atty., A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, George J. Bott, Gen. Counsel, and Marshall J. Seidman, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Cyril E. Pogue, Clearwater, Fla., McMullen, McMullen & Pogue, and Chester B. McMullen, Clearwater, Fla., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

HOLMES, Circuit Judge.

This is a petition for the enforcement of an order of the National Labor Relations Board, which was issued pursuant to Section 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq. The respondent is a Florida corporation engaged in the business of packing, processing, and shipping citrus fruits; its principal place of business is in Clearwater, Florida. On June 19, 1951, a complaint was issued against respondent by the regional director of the Board alleging that it was and had been engaged in certain unfair labor practices.

After a hearing, the trial examiner found that the respondent had violated Section 8(a) (3) of the Act by discriminating in regard to the employment of one Mary Rudd because of her union activities; also that it was guilty of unfair labor practices, within the meaning of Section 8(a) (1), by reason of interfering with, restraining, and coercing Rudd and other employees in the exercise of their rights guaranteed by Section 7 of said Act. The Board substantially adopted the examiner's findings, but dismissed a complaint that respondent had threatened to discharge its employees or to effect other economic reprisals against them for joining the union.

The order of the Board directed respondent to cease and desist from (a) dis-

couraging membership in any labor organization; (b) discriminating against its employees in regard to their employment; and (c) interfering with, restraining, or coercing its employees in the exercise of their rights of self-organization, to bargain collectively, or engage in other mutual aid or protection. It directed said respondent to reinstate Mary Rudd to her former position, with all seniority rights, and to indemnify her for any loss suffered; to post compliance notices; to make available to the Board certain pertinent records; and to notify the regional director of steps taken in compliance with the order.

The business of respondent was conducted on a seasonal basis, each packing season beginning about the first week of October and ending in July of the following year. Seven or eight women were employed as packers in its plant. Mary Rudd was first employed as a packer in 1936, and continued to work through part of the 1940–41 season, when she resigned to seek employment nearer her home. In about January, 1948, she returned to respondent's plant and worked continuously on a full-time basis until November 30, 1950. At the time of her return to the plant, E. R. Sessions, the foreman of the respondent, requested that she transport other employees to and from the plant in her automobile, which she did throughout the period of employment until her discharge.

On or about November 15, 1950, an employee of another company by the name of Newton contacted Rudd and solicited her aid in the unionization of respondent's employees. Thereafter, she discussed the union with the other employees during her lunch periods and other non-working hours, and, on November 23, 1950, distributed union application cards which had been supplied to her by a union organizer named E'Dalgo, collecting a number of the signed cards on the following day. On several occasions thereafter she had conversations with Newton with regard to the organizational drive. During the middle of November, Sessions inquired of two other employees, by the names of Ringer and Blackburn, as to whether they had heard

anything about the union and if they were interested in the union. On November 30th, he asked Sheppard and Carter, employees of respondent, if they had heard of the union, and asked the former if she knew who had started it.

On the night of November 30th, Sessions prepared a check for Rudd's wages, which he marked "paid in full," and personally delivered it to her at her home. Without any previous explanation, he informed her that the company would not need her any more. She expressed surprise, and asked why she was being fired. Sessions replied that there was nothing wrong with her work; that she was a good packer; that she had been picked out of a group as one to be discharged; and that he was merely "carrying out the orders of the boss." Rudd's husband, who was present during the conversation, suggested that she call E'Dalgo, the union organizer, because she knew that they were firing her for union activities. Sessions then turned to Rudd and said: "If you know why I am firing you, that is reason enough, and I don't have to tell you. If you know the reason, that is reason enough."

Upon being contacted by E'Dalgo with regard to Rudd's discharge, J. W. Coachman, respondent's general manager, denied that she had been fired, stating that she had merely been laid off for economic reasons. Both Coachman and Sessions testified that the first time they had heard anything about union activities in the plant was during the conversation with E'Dalgo. On December 8, 1950, Rudd was recalled to work as an "extra" employee, and continued in that capacity until December 23, 1950, when the plant was closed for a ten-day vacation. She was called to work again on January 23, 1951, and worked until February 10, 1951. After working only three days in April, five days in May, and the first week in June, she was informed that no further work was available.

The primary question presented on this appeal is whether there was substantial evidence to support the Board's finding that Rudd was discriminatorily discharged because of union activities. Evidently the Board was impressed with the inconsisten-

cy between respondent's explanation of the employee's discharge and the facts revealed by the other evidence. Also there was a notable coincidence between the beginning of Rudd's union activities and her discharge by the company. On November 30, 1950, only two weeks following commencement of the drive, she was suddenly and without apparent reason relieved of the duties that she had performed for at least six years, although she was first in seniority over other employees. Despite the fact that Rudd's check, marked "paid in full," was delivered to her by the foreman at her home, while the wages of three other employees who had worked during the month of June were delivered to them in routine manner at the plant, the foreman could offer no complaint as to her work, and could only state that he had picked her out of the group, telling her at the time that he was only following orders. This was done even though, at the foreman's request, she had daily transported other employees to and from their work at the plant. When Rudd's daughter, in the presence of Sessions, asked her if she was being fired and, in effect, Rudd answered that she was, Sessions did not deny it; neither did he deny it when Rudd's husband accused him of firing his wife. It was on this same day that Sessions interrogated Sheppard and Carter about their knowledge of the union.

Although Rudd had worked two full seasons immediately prior to the 1950–1951 season, and two other employees had not been hired until 1950, respondent contends that she was considered as an extra or seasonal employee and was laid off in advance of regular employees because there was an insufficient supply of fruit on hand for packing. There is no evidence, other than that of company officials, that she had been in such a category prior to her discharge. No more than five days elapsed between the date of her discharge and the day when she was recalled for extra work. Furthermore, Sessions was aware that the Christmas rush at the packing plant was due to begin within about a week from the day he informed her that she was no longer needed.

There being substantial evidence to support the Board's finding that Rudd was discriminatorily discharged for her union activities, and that being the determinative question presented for our decision, it is ordered that the petition of the Board be, and the same hereby is, granted; but it is not contemplated that back payments be made for periods when the plant was shut down.

Enforced.