228 F.2d 791
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TRUCK DRIVERS & HELPERS LOCAL UNION NO. 728, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, A.F.L. and R. C. Cook, its Business Agent, Respondents.
 No. 15651.
 United States Court of Appeals Fifth Circuit.
 January 17, 1956.
 
 Irving M. Herman, Atty., N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Theophil C. Kammholz, General Counsel, David P. Findling, Associate General Counsel, Frederick U. Reel, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.
 Fred W. Elarbee, Jr., Edwin M. Pearce, Jr., Atlanta, Ga., Poole, Pearce & Hall, Atlanta, Ga., for respondents.
 Before HUTCHESON, Chief Judge, and BORAH and BROWN, Circuit Judges.
 BORAH, Circuit Judge.
 
 
 1
 The National Labor Relations Board seeks enforcement of its order[1] to cease and desist from certain unfair labor practices. The Board found that respondents had violated Section 8(b) (4) (A) and (B) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq.,[2] by inducing and encouraging the employees of Ford Motor Co. and Motor Convoy, Inc., with neither of whom the respondents had a dispute, to engage in a strike or concerted refusal to perform services for their respective employers, with the objects thereof being (1) to force Ford to cease doing business with National Trucking Co., and (2) to force National to bargain with respondent Union although said Union had not been certified as the bargaining representative of National's employees.
 
 
 2
 The Board's order was bottomed upon two separate, but closely related charges filed by National which the Board, on its own motion, consolidated for decision and order. The first charge, filed against the Union and its business agent, related to picketing by the Union on April 16, 1954, and as to this charge, the trial examiner found that respondents had not engaged in unfair labor practices. The second charge which was filed against the Union alone, related to Union picketing on and after July 9, 1954, and to a work stoppage by the respondent's members who were employed by Motor Convoy, Inc. In this proceeding, a hearing by the trial examiner was waived, and the case was submitted to the Board upon the charge, complaint, answer, notices, and a stipulation of the parties.
 
 
 3
 The basic facts, as found by the Board on report of its trial examiner in respect to the first charge, are not seriously in dispute. We summarize them as follows: National Trucking Co.'s only operation was to load and haul away vehicles assembled at the Ford Motor Co. plant in Hapeville, Georgia. National's terminal and loading yard was directly across South Street from the large, fenced area occupied by the Ford assembly plant. There was no entrance to the Ford plant on South Street — a side and dead-end street — but National's sole access to the plant for pickup of the vehicles was through a gate on Central Avenue at a point several blocks distant from the intersection of South Street and Central Avenue. This entrance gate was reserved by Ford exclusively for National's use. It was thirty-five feet removed from Ford's employee entrance gate which was used by Ford's workers at all hours of the day. To obtain the Ford cars for transportation, the procedure which National customarily followed was to send three or four drivers over to Ford's plant to inspect and pick up new automobiles and then drive them back to National's terminal on South Street approximately one-half mile away. These three or four employees were driven to the pickup gate in a truck owned by National, the driver of the truck waiting at the gate until the new cars were inspected by National's employees, whereupon they were driven back to National's terminal followed by the driver of the truck who then repeated the operation described. These particular employees made approximately forty such trips daily.
 
 
 4
 Early in 1954, respondent Union requested that National recognize it as the bargaining representative of National's employees. This request was never agreed to and after further attempts to gain recognition failed, the Union began picketing National's South Street terminal. On April 16, 1954, four days after the picketing began, Joseph A. Vaske, the Union's representative in charge of picketing, went to the Ford plant and informed Robert C. Chinn, Ford's industrial relations manager, and one Young, the president of the labor organization representing the Ford employees, that respondent Union was planning to picket National's vehicle each time it arrived at National's entrance gate on its periodic trips to pick up new Fords, but that such picketing was "not to be intimated in any way against Ford." Chinn objected on the ground that such picketing would interfere with the work of Ford employees. He then asked Vaske: "Well, as a matter of fact, are you wanting to put your pickets there for the purpose of letting our [Ford] employees know you are on strike?" to which Vaske made no response, but simply "smiled". Within an hour or two after this meeting, National's vehicle arrived at the Ford plant, discharged the pickup men, stopped about sixty feet from National's pickup gate, or ninety feet from the Ford employee gate, and Vaske then commenced to picket it with a sign which read: "Employees of National Trucking Company, Members of Local No. 728, A. F. L. on Strike." About twenty minutes thereafter two local policemen put an end to the picketing and later on the same day a Georgia state court issued an order enjoining the picketing at places other than at National's terminal. It is conceded that none of Ford's employees actually engaged in a strike or work stoppage as a result of the picketing.
 
 
 5
 The stipulated facts relating to the picketing on and after July 9, 1954, which was condemned in the second charge and complaint, are these: On July 9 and 10, after the state court injunction was dissolved, the Union again picketed the Ford gate used by National employees at times when the latter were there to pick up new cars. On July 10, National contracted with Air Travelers, Inc., for the latter to perform the car pickup operations between the Ford plant and the National terminal. In its answer to the complaint respondent Union alleged that when the Union was informed of this contract it "began, in an effort to salvage [its] previous organizing activities, to organize the employees of Air Travelers, Inc., who were then performing duties which employees of National Trucking Company had previously been doing. Local Union No. 728 had requested to represent these employees and the taking away of this work adversely affected the interest not only of Local Union No. 728, but of the striking employees who were attempting by the means of a peaceful strike to induce National Trucking Company to recognize Local Union No. 728 as their collective bargaining agent." Air Travelers assigned three of its ten employees to perform pickups under the contract and since July 19 the Union has picketed Air Travelers' terminal and the Ford's gate reserved for National's use whenever Air Travelers' employees arrive there to pick up the new cars, with signs reading: "Truck Drivers and Helpers Local Union 728, Picketing Air Travelers, Inc. for Purposes of Organization. We invite you to join our Local Union [followed by full name of Union]." It was further stipulated that the pickets were stationed at the National gate between the hours of 7:30 a. m. and 5:30 p. m., but that the sign was aloft only when the Air Travelers' pickup men were there periodically throughout the day, between the hours of 10:30 a. m. and 6:30 p. m., and that Ford's 1400 employees normally work between the hours of 7:30 a. m. and 4:30 p. m.
 
 
 6
 With reference to the work stoppage at Motor Convoy, Inc. which was alleged in the second complaint, it was stipulated: That Motor Convoy was engaged in the same work as National, and picked up and transported seventy percent of Ford's new cars. That respondent Union had a collective bargaining contract with Motor Convoy, and although there was no labor dispute with Motor Convoy, on July 26, 1954, the Union shop stewards submitted the following notice signed by its employees:
 
 
 7
 "We the [undersigned] do hereby issue notice to Motor Convoy that due to the Strike at National Trucking Co. we refuse to operate until it is settled. This is due to the fact that we feel it unsafe because of our trucks being run off the road and one being blown up. We are in fear of bodily harm."
 
 
 8
 It appears that at some time prior to July 26, a Motor Convoy trailer was sideswiped by a hit-and-run driver and another loaded Motor Convoy trailer was dynamited. Both events occurred in areas jointly traveled by Motor Convoy and National, but there have been no incidents of a similar nature since July 26, nor was there any evidence to establish responsibility for these occurrences. It was further stipulated that the Motor Convoy employees did not work on July 26, but the following day, upon notice from Motor Convoy that it considered the work stoppage a breach of their contract, the respondent Union called a meeting of the striking drivers and instructed them to return to their jobs, and that evening they reported for work and no such work stoppage subsequently occurred.
 
 
 9
 With respect to the charge relating to the April 16, 1954, picketing, the trial examiner found that there was "not an iota of direct evidence that any employee, of any other employer than National, even saw the picket sign in question" and that there was no evidence of "either action or of a statement of intent" upon which he could base a finding that the respondents attempted to induce the employees of Ford to engage in strikes or concerted refusals to perform work with the object of forcing Ford to cease doing business with National. Having so found he concluded that the character of the picket signs and respondents' own statements that they were not engaging in outlawed behavior were sufficient to establish that there had been no violation of the Act.
 
 
 10
 The Board rejected the findings of the trial examiner and found that the National employees engaged in the pickup operations had to cross the picket line at National's terminal twice on each of their approximately forty daily trips. It also found that the general area in which respondent Union stated its intent to picket National's vehicle was about thirty feet from the entrance to the plant used by Ford employees. It was thus clear to the Board that respondents' principal object in picketing in front of Ford's premises was not to reach National employees, but rather that the respondents picketed National's truck near Ford's employee entrance to apprise Ford employees of its dispute with National and to attempt, thereby, to induce and encourage Ford's employees to cease work. As the respondents' ultimate object was to force National to recognize respondent Union as the representative of the employees, the Board found that respondents' picketing of National's vehicle violated Section 8 (b) (4) (A) and (B) of the Act.
 
 
 11
 As to the second charge, the Board found that Air Travelers was in effect an alter ego of National, hence, it concluded that the picketing of Air Travelers' employees at Ford's premises, violated the Act for the same reasons which outlawed the picketing when the pickup work was being performed by National's own employees. It also found that the work stoppage at Motor Convoy was caused by the respondent Union with the object of requiring Ford to cease doing business with National.
 
 
 12
 Respondents resist enforcement of the Board's order principally on the grounds: (1) that their only activity has been peaceful picketing directed toward primary employers, National and Air Travelers, which is guaranteed and protected by the First Amendment to the Constitution of the United States and Sections 7 and 13 of the Act; and (2) that the finding that the picketing was for an unlawful purpose is not supported by substantial evidence on the record as a whole.
 
 
 13
 As to the first contention with respect to peaceful picketing, it is sufficient to say that the Supreme Court has held that peaceful picketing is not exempted from the condemnation of Section 8(b) (4) where an objective, although not necessarily the only objective, was to induce or encourage concerted action by the employees of a secondary employer. International Brotherhood of Electrical Workers Local 501, A. F. L. v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. Under the authority of this case, it must therefore be held that respondents have violated the Act if the Board correctly inferred that the picketing had as one of its objectives a purpose which is prohibited by Section 8 (b) (4) (A) and (B) of the Act. The Board found, as it was obliged to do on the virtually uncontroverted evidence, that for each of the forty daily trips that National's employees made to pick up new Ford cars, they twice passed through respondents' picket line at National's South Street premises. On the basis of this finding it drew the reasonable, and we think the logical inference that respondents picketed National's truck near the Ford employee entrance to apprise Ford's employees of its dispute with National and "to attempt, thereby, to induce and encourage Ford's employees to cease work." Obviously, the establishment of a picket line at Ford's plant was plainly superfluous if intended only to publicize the dispute with National among National's employees. The respondents, citing our recent decision in the case of N. L. R. B. v. General Drivers, Warehousemen & Helpers, Local 968, 5 Cir., 225 F.2d 205, contend that the Board in drawing the inference that the picketing at the Ford plant was for an unlawful purpose, disregarded the precautions that respondents had taken to insure that secondary employees did not become involved. We do not agree. The authority upon which respondents rely is inapposite and clearly distinguishable on its facts. In the General Drivers case, we recognized that the Board was not empowered, under the guise of fact findings, to fix the situs of a labor dispute at only one of a primary employer's numerous business activities, thereby isolating other employees of the same primary employer from exercising their statutory right, under Section 7 of the Act, to engage in mutual aid and protection and make common cause with their co-workers involved in a labor dispute. In General Drivers, the union was permitted merely to picket the common premises in order to reach other employees of the primary employer, who, as we especially noted, almost never came to the primary employer's principal situs, the warehouse. Furthermore, in that case, the criteria evolved by the Board in Moore Dry Dock, 92 N.L.R.B. 547[3] were scrupulously observed. And as we pointed out, both in our opinion and in footnote 3, the union was careful to inform the secondary employers, the public, and the employees approaching the picket line (by signs, handbills, or verbal statements) that the dispute in no way involved any secondary employers.
 
 
 14
 In the case at bar the factual situation is different from those which were presented in General Drivers and it is, of course, a fundamental proposition that each case must be considered in the light of its surrounding circumstances. Here, it was clearly not necessary for respondent Union to picket at Ford's premises in order to reach National's employees for all of National's employees not only could be but they were in fact notified of the labor dispute by the picketing at National's terminal on South Street. Here, respondent did not comply with the Moore Dry Dock condition which is that the picketing must disclose "clearly" that the dispute is with the primary employer. The requirement of a clear disclosure is not met by a single, self-serving statement such as was made by Vaske, under the circumstances heretofore mentioned. Here, the facts speak more eloquently than the spoken words, and Vaske's significant silence when he was asked whether the purpose of the picketing at Ford's premises was not to let Ford's employees know of the dispute, obviously cannot be characterized as a clear disclosure.
 
 
 15
 We are also of the clear opinion that the Board rightly rejected the trial examiner's finding that there was "no direct evidence" that any Ford employee saw the picketing. All of the pertinent evidence detailed above, including the testimony of respondent's witness, Vaske, plainly supports the Board's position. Hence, what the Board here overturned was not a finding based upon credibility, as to which the trial examiner's determination is usually entitled to special weight, but a finding made without support in the evidence. As for the Board's rejection of the examiner's findings that the evidence did not sustain the charge that the picketing induced and encouraged the Ford employees to cease work, this was but the ultimate inference to be drawn in the case on the basis of the facts, which were virtually undisputed. And where, as here, the evidence is susceptible of two inferences it is for the Board and not the court to make the determination, N. L. R. B. v. Robbins Tire & Rubber Co., 5 Cir., 161 F.2d 798, for it is not within our province to displace the Board's choice between two fairly conflicting views. Cf. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.
 
 
 16
 As to the finding in reference to picketing of Air Travelers at the Ford plant, we are in agreement with the Board that Air Travelers and National operated under a close contractual relationship; that Air Travelers' employees substituted directly for National's pickup employees, and that in this context Air Travelers was not a neutral primary employer, but was an ally of National in the labor dispute. Furthermore, and in this connection we may add that the pickets were on duty some three hours before Air Travelers' pickup employees began their daily duties, and that they abandoned their picketing one hour before Air Travelers' employees workday ended, but were significantly present for at least an hour after the Ford employees' quitting time. Accordingly, we conclude that there is substantial evidence in the record, considered as a whole, to support the finding of the Board that an object of this picketing was also to bring about a strike or concerted refusal to work on the part of Ford employees.
 
 
 17
 We are likewise in agreement with the Board's finding that the work stoppage at Motor Convoy was brought about by respondent Union with an object of forcing Ford to cease doing business with National. The notice of work stoppage, which was presented by respondent Union's shop stewards, stated explicitly that the stoppage was due to the strike at National, and the asserted fear on the part of those Motor Convoy employees who signed the notice is incompatible with the ease with which the Union was able to persuade them to return to work on the following day without any assurance of safer working conditions. Thus, we find that the record justifies the Board's finding that the Union fostered and was in complete control of the work stoppage.
 
 
 18
 The petition for enforcement of the Board's order is granted.
 
 
 
 Notes:
 
 
 [1]
 The Board's decision and order are reported at 111 N.L.R.B. No. 68
 
 
 [2]
 Hereinafter referred to as "the Act"
 
 
 [3]
 In that decision, the Board held that common-situs picketing, in order to qualify as primary and lawful, must meet all four of the following conditions:
 (a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;
 (b) at the time of the picketing the primary employer is engaged in its normal business at the situs;
 (c) the picketing is limited to places reasonably close to the location of the situs; and
 (d) the picketing discloses clearly that the dispute is with the primary employer. 92 N.L.R.B. 547, 549.