**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**E. L. DELL, Jr., Trading as Waycross Machine Shop, Respondent.**

**No. 18060.**

United States Court of Appeals
Fifth Circuit.

Oct. 14, 1960.

---

Duane B. Beeson, Atty., N.L.R.B., Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Hans J. Lehmann, Atty., N.L.R.B., Washington, D. C., for petitioner.

E. Kontz Bennett, Waycross, Ga., for respondent.

Before RIVES, Chief Judge, and JONES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case is before the Court on a petition by the National Labor Relations Board for enforcement of its order against E. L. Dell, Jr., trading as Waycross Machine Shop.[1] The Board found that the Company violated the National Labor Relations Act by interfering with the rights of its employees to organize a union, by discharging certain employees because of union activities, by refusing to bargain with the Union,[2] thereby causing a strike, and by refusing to reinstate the striking employees. 123 NLRB No. 163. The Board's order requires the Company to bargain with the Union, to cease and to desist from unfair labor practices, and to reinstate with back pay the employees discriminatorily discharged and all striking employees who

offered to return to work.[3] We grant enforcement of the Board's order.

The Union's story and the Company's story and the inferences each draw from the same facts differ in many points, major and minor. This conflict is pointed up by the difference between the findings and legal conclusions of the Trial Examiner and those of the Board. In large part, the Trial Examiner found for the Company. On almost every point favorable to the Company, the Board reversed the Trial Examiner. This conflict does not change the criterion we must follow in reviewing the decision of the Board.[4] Weight should be given the finding of a Trial Examiner on a matter involving the credibility of witnesses, but the Court still must determine if the *Board's* findings are supported by "substantial evidence on the record considered as a whole". 29 U.S.C.A. § 160(e); N.L.R.B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 568; N.L.R.B. v. Truck Drivers Local Union No. 728, 5 Cir., 1956, 228 F.2d 791, 796.

The Company produces practice bombs and similar military items upon orders of the armed services at its plant in Waycross, Georgia, where it employs about a hundred employees. E. L. Dell, Jr., started the business. Later he took on his four brothers as partners. Each of the brothers participates actively in the management of the Company.

1. Pursuant to Section 10(e) of the National Labor Relations Act, as amended. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

2. International Brothers of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO.

3. The Board decided that no back pay was due for the period between the dates of the Trial Examiner's Intermediate Report and the Board's Decision and Order. The Trial Examiner found no violation as to Amerson, Vaughn and Simmons and as to the refusal to reinstate the strikers.

4. In Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 496–97, 71 S.Ct. 456, 469, 95 L.Ed. 456, the Supreme Court stated:
"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'"

Until 1956 the employees were unrepresented in bargaining matters. In September 1956 two employees, Henry Gladden and O. C. Simmons, notified the district headquarters of the Union that "the boys in the Waycross Machine Shop were desiring a union." Two district representatives of the Union met Gladden and Simmons in Waycross, collected authorization cards from them and other employees, and on the following day informed the Company that the Union intended to conduct an organizing campaign. October 5, 1956, the Union filed a petition with the Board requesting an election. February 1, 1957, the election was held. 66 votes were cast for the Union. 28 votes were cast against it. February 11, 1957, the Union was certified as the collective bargaining representative of the Company's employees.

During the campaign before the election Company officials made no bones about opposing the Union. Thus, the evidence is that in September 1956, Leon Dell, General Manager, questioned Lee Burkett about the Union and told him that only the skilled employees would be retained if the plant were unionized. About the same time E. L. Dell threatened to close down the plant and replace employees if the Union "came in". Similarly, in November or December Leon Dell assured employee O. C. Simmons that the Company's existing contracts would permit continuous operation without layoffs through March, "if this other thing did not come in—you know what I mean."

The charge in this case was filed April 8, 1957. The Board found therefore that statements made in September or October did not constitute unfair labor practices, *under the Act,* since they occurred before the six-month limitation period provided in Section 10(b) of the Act. The Board relied upon these statements for background purposes in evaluating conduct occurring within the limitation period. We find that the record as a whole supports the Board's holding.

### I.

■■ The Board and Trial Examiner agree that the Company interfered with the right of its employees to organize. There is ample evidence to show that the Company, in a context of hostility, interrogated employees concerning their union activities, threatened them with economic reprisal for such activities, and promised economic advantages to employees if the Union did not succeed in organizing the plant. This conduct was clearly in violation of Section 8(a)(1) of the Act. N.L.R.B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 409–10; N.L.R.B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 89–90.

### II.

■ The Board found that the Company discriminatorily discharged employees Gladden, O'Neal, Amerson, Vaughn, Smith, and Simmons in violation of Section 8(a)(3) and (1) of the Act.[5] The Company denies that the discharges were discriminatory. Union activity and union membership confer no immunity against discharge. N.L.R.B. v. Birmingham Publishing Co., 5 Cir., 1958, 262 F.2d 2, 8–9. But it seems to us that it was more than a coincidence that each discharged employee was active in the Union organizing movement and each was discharged during the period when the Company was opposing the Union by threats, promises, and other unlawful acts of interference. The record fairly permits the conclusion that anti-union motivation lay behind the Company's action.[6] We hold that substantial evidence

5. The Board and the Trial Examiner concurred in finding that the Company's anti-union bias motivated the discharge of Gladden, O'Neal, and Smith. The Trial Examiner, however, recommended that the complaint be dismissed respecting employees Amerson, Vaughn and Simmons. In reversing the Trial Examiner as to these employees, the Board drew a different inference as to the Company's motivation but did not depart from his findings of fact.

6. Henry Gladden began work for the Company in June 1956 as a welder, his occupation since 1939. Soon after he start-

supports the Board's findings that the Company discriminatorily discharged employees Gladden, O'Neal, Amerson, Vaughn, Smith, and Simmons in viola-

ed work with the Company he became interested in the Union. Gladden and another employee, O. C. Simmons, asked the district representatives of the Union how to organize the Company's employees. Later, Gladden solicited Union membership, checked the eligibility of voters for the Board election, and openly talked to representatives of the Union in front of the shop and in the presence of Company officials.

On January 30, Gladden came out of a crowded rest room shortly after the end of the rest period. According to his testimony, the General Manager, Leon Dell, summarily discharged him at that time giving as the reason that "you know better than to be in the toilet when the whistle blows". Gladden asked Dell about other employees who were still in the rest room, but received no answer. Apparently, the others who remained in the rest room longer than Gladden were not reprimanded. At the hearing the Company gave other reasons for Gladden's discharge: excessive absenteeism, having a thirty minutes' conversation with another employee during working hours on the day before he was fired, and being slow in his work on the day of the discharge. Gladden's absences, however, were caused by illness in his family, and had been specifically approved by Leon Dell. The conversation with the other employee had actually taken place 3 or 4 weeks prior to the discharge, and did not interfere with Gladden's work. Gladden had at no time been criticized by any of his supervisors for slowness in his work.

O. C. Simmons who had worked as a welder since 1942 was hired by the Company in July 1956 as an arc welder. He and Gladden initiated union organization among the Company's employees. Simmons was an observer at the election and became a member of the negotiating committee of the Union. In February 1957 he was discharged by General Manager, Leon Dell, on the ground that his vertical welding work was unsatisfactory and he had failed Navy vertical welding tests. In fact, Simmons had passed the Navy tests in November 1956. He had failed them earlier, but the Company took no action against him at that time or on that account. After being discharged, he passed additional tests at another plant and was given a job with them at any hourly rate of $2.68 as compared with the hourly rate of $1.35 which he had earned with the Company. The new job required a substantial amount of vertical welding.

Irving Amerson and Earnest P. Vaughn were both leaders in the Union's organizational campaign. Amerson actively distributed Union cards to other employees, and after the election of February 1, 1957, he wore a Union button conspicuously. Amerson received training as a welder under the G. I. bill and worked as such since 1946. The Company hired him as a laborer in June 1956, later assigning him to work as an acetylene welder. Vaughn, who had been employed by the Company three times previously and had been laid off twice for lack of work, was taken on as an acetylene welder in 1956. He was a member of the Union before starting to work for the Company. He attended most of the Union meetings held by the employees of the Company, and was a member of the negotiating committee. Both Amerson and Vaughn earned $1.35 per hour at the time of their discharge.

On February 25, 1957, Amerson and Vaughn were working on the same welding assignment. Vaughn finished his portion of the work first and manager Keefer Dell told him that he, Vaughn, had been replaced with a mechanical spot welding machine and asked him to turn in his tools and badge. Vaughn requested that he and his partner Amerson get the job of operating the new spot welding machine, but Dell made no reply and walked away. Amerson finished working late in the afternoon that same day and was also discharged by Keefer Dell with the same explanation as that given to Vaughn. The Company hired new, unskilled employees to work on the mechanical spot welder machine. Although the hourly rate for the new job ($1.00 per hour) was substantially less than that for acetylene welding, both Amerson and Vaughn repeatedly expressed to the Company their willingness to operate the new machine at the rate paid their replacements. Nonetheless, the Company hired new men and gave no explanation for not continuing Amerson and Vaughn. Amerson inquired about re-employment with the Company after his discharge and Keefer Dell asked him in reply whether the Union had promised to get him a job, suggesting he "go talk to them".

Willard O'Neal, hired by the Company in July 1956 at $1.00 per hour, threaded lugs for bombs. He wore a Union button to work, was an observer at the elec-

tion of Section 8(a)(3) and (1) of the Act.

### III.

The main controversy is whether the Board correctly determined that the Company unlawfully refused to bargain with the Union.

The Union was certified as the bargaining representative of the Company's employees February 11, 1957. At a bargaining meeting in March 1957 the parties discussed a draft of a contract that had been submitted by the Union to the Company. Before a second meeting in April, the Company furnished the Union with a counterproposal limited to matters agreed upon in the first bargaining session and omitting wage scales, classifications, group insurance, and other matters covered in the Union proposal. At the second meeting the Company's attorney, E. Kontz Bennett, promised that he would furnish the Union a complete contract that the Company would be willing to sign. Such a document was never sent to the Union. Soon after the second meeting Bennett received a letter dated April 2, 1957, postmarked April 3, from the Union's district representative, George, stating that if an agreement were not reached by May 3, 1957, the Union's membership would be forced "to take strike action in accordance with our International Constitution and By-Laws." After waiting several days for the contract proposals promised by Bennett, George telephoned him. Bennett stated that he considered the Union's letter a threat. George answered that the letter was written to comply with Georgia law requiring unions to give employers 30 days' notice of intent to strike.[7] Bennett thereupon renewed his promise to submit a contract draft but would not set a date for doing so.

George did not receive the promised contract from the Company. Accordingly, he requested the Federal Mediation and Conciliation Service to help arrange bargaining meetings with the Company. George met with an officer of the Service several times in April and May. The officer called on Bennett, but was not successful in arranging further negotiations. The Union thereupon called a strike for May 23.

In May 1957 the Union assigned Clifford L. Stave, its District Representative, to replace George as the Union's representative in the dispute with the Company. Stave arrived in Waycross on May 20, cancelled the strike notice and called at the office of E. L. Dell. Dell referred Stave to Bennett, who conferred with him several days later. During the conference Bennett told Stave that the Com-

---

tion, and was appointed to the Union's negotiating committee immediately after the election. After the shutdown following the election O'Neal was assigned to drill holes in bombs at a new machine. The Company hired a new man and assigned O'Neal to train him to use the machine. After training the new employee O'Neal was re-transferred to his prior job of threading lugs. He worked at it for a few days and was then discharged. The reason given by Lloyd Dell was that "under the new contract the lugs already came threaded," but no explanation was given why O'Neal was transferred to a job scheduled to be discontinued.

Leon Smith joined the Union, attended meetings regularly and wore his Union button on the job. Beginning March 15, 1957, he was not at work several days because of illness. Having no telephone, Smith attempted to comply with the Com-

pany's rule that absences from work be reported by 8 A.M. of the same day by sending his wife to the home of James Curl, the nearest neighbor who worked for the Company, to ask him to report Smith as sick. Curl had already left for work, so Smith's wife left the message and Curl reported to the Company the next day that Smith was ill. When Smith returned for work on the following Tuesday, he found his card missing from the rack. He inquired about it and Lawton Dell told him that he had been replaced but gave him no explanation other than saying that "it is one of those things." Nothing had been said to Curl about Smith's absence when he reported Smith ill, and Smith, who had been absent from work only once before, had never been warned against excessive absenteeism.

7. Act 293, Laws of 1941, Chap. 54–7, Georgia Code.

pany "could not bargain with the Union because of the threat that had been made in Mr. George's letter." Immediately after the meeting with Bennett, Stave went to the office of E. L. Dell, who refused to see him. Stave then called a strike for May 27.

Stave continued to try to bargain with the Company after the strike began. On June 5, he wrote to E. L. Dell and expressed the Union's willingness to resume negotiations. He did not receive a reply. In the middle of July he went to E. L. Dell's office but was told that Dell was too busy to see him. In late July Stave saw Bennett in his office and asked whether anything could be done to resume negotiations. During the course of the strike, Stave made several calls to the Federal Mediation and Conciliation Service attempting to bring about a meeting of the parties, but the Service was unsuccessful again. September 20 Stave wrote E. L. Dell a final letter requesting negotiations. He received no response. The two bargaining meetings in March and April were all that were held between the Company and the Union.

The Trial Examiner found that the Union did not bargain in good faith, that it threatened to destroy the Company's business, tried to intimidate Company officials, engaged in such coercive activities as bloody beatings of pro-Company workers, and that the strike was economic. The Board, overruling the Trial Examiner, concluded that after receiving the Union's letter of April 2, 1957, the Company in bad faith refused to bargain with the Union. There is unquestionably substantial evidence to support such a conclusion that necessarily depends on drawing inferences from uncertain facts and weighing one inference against another.

The Board rejected the Company's contentions that the threat of strike action justified a break-off of negotiations and that an impasse in bargaining had been reached. The Board also ruled that three strike incidents involving employee misconduct did not relieve the Company of its obligation under the Act to bargain with the Union.

■■ Whether a strike actually was intended by the Union at the time the "threatening" letter was written to the Company is problematical. However, even accepting the Company's view that there was a "strike threat" as justified, such a threat does not warrant a refusal by the Company to bargain. "A strike does not in and of itself suspend the bargaining obligation, * * * which would encompass a willingness, not a refusal, to meet and confer with the Union." N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 5 Cir., 1957, 245 F.2d 594, 596. The Supreme Court has pointed out that economic pressure from a Union is no excuse for a company to refuse to bargain: "The scope of § 8(b)(3) and the limitations on Board power which were the design of § 8(d) are exceeded, we hold, by inferring a lack of good faith not from any deficiencies of the Union's performance at the bargaining table by reason of its attempted use of economic pressure, but solely and simply because tactics designed to exert economic pressure were employed during the course of the good faith negotiations." N.L.R.B. v. Insurance Agents' International, 1960, 361 U.S. 477, 80 S.Ct. 419, 427, 4 L.Ed.2d 454, 464–65. If there is no inconsistency between a union's applying economic pressure and good faith collective bargaining, and if "economic pressure" includes a full strike itself, then a fortiori the threat of a strike is not inconsistent with good faith collective bargaining.[8]

8. The requirement that an employer continue to bargain during a strike or following a threat of strike has long been recognized. N. L. R. B. v. Pecheur Lozenge Co. Inc., 2 Cir., 1953, 209 F.2d 393; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 1942, 130 F.2d 919. It is unquestionably correct, as the Company contends, that the obligation to bargain in good faith rests upon both labor and management. This principle was the rationale behind the holding in N. L. R. B. v. Express Pub. Co., 5 Cir., 1942, 128 F.2d 690, on which the Company strongly relies. In that case we held the publisher not in contempt for refusing to

Nor does it appear that negotiations had reached an impasse. Actually, negotiations had hardly begun when the Company refused to bargain further. The parties had neither exhausted bargaining possibilities nor reached the stage where further meetings would have been fruitless. Assuming, however, that there was an impasse originally, the Union showed a willingness to start new negotiations when it assigned a new representative to assist in the dispute. The new organizer called off the strike and made bona fide efforts to resume bargaining.[9]

■ The Company attempted to justify its refusal to resume bargaining because of three instances of violence that occurred during the four months of the strike. These acts took place away from the plant, and it is not suggested that the Union itself was in any way responsible for them. There was no substantial interference with the ingress to and egress from the plant during the strike. There was no violence on the picket line. In these circumstances, the misconduct did not relieve the Company of its obligation to bargain with the Union.

■ On the record as a whole, we find substantial evidence to support the Board's finding that the Company unlawfully refused to bargain with the Union.

### IV.

The strike began May 27, 1957. It lasted four months. Initially, about sixty employees walked out. The Company immediately began to replace them. September 26, 1957, Union representative Stave wrote a letter to the Company advising it that the striking employees had voted to discontinue the strike and that they unconditionally requested reinstatement to their former or "substantially equal" jobs. The letter, referring to an attached list of ninety-one striking employees, stated that the strikers would make personal appearances to reaffirm the request. Thirty-five strikers applied in person for reinstatement at the respondent's plant. With one possible exception, none was reemployed. The Board found that fifty-eight employees were strikers and that all of them had applied unconditionally for reinstatement, either in person or through the Union. The Board concluded that since the strike was caused by the Company's unlawful refusal to bargain, the striking employees were unfair labor practice strikers. As such, except for five who engaged in misconduct during the strike, they were entitled to reinstatement upon their unconditional offer to return to work, regardless of whether they had been replaced. The Board found that the striking employees had made such an unconditional application through the Union's letter on their behalf, as well as by individual application in some cases, and determined that upon receipt of the September 26 letter the Company was obligated to rehire the strikers.

■ Whether the striking employees should have been rehired depends on whether the strike was economic or was caused by the Company's unfair refusal to bargain in good faith. The Company contends that the strike was economic in character, because the Union sought thereby to achieve its contract objectives. The Union contends that it wished to attain its economic objectives by negotiation, not by strike. As the Board saw it, economic pressure was not brought into play until the Company refused to bargain. At that point the Union had to

---

bargain where the Union had abruptly broken off with the intention of compelling acceptance of the proposed contract by coercion. That is not at all the same situation we have here. Not only did the Union here try to obtain negotiations, but we can find no such unfair activity on the union's part as would justify the Company's adamant refusal to resume negotiations.

9. This phase of the case would suffice to distinguish it from the Express Publishing Co. case relied on so heavily by the Company. See footnote 8, supra. Thus, even if we were to find the Company justified in suspending negotiations with the first organizer, George, we cannot justify the Company's refusal to deal with the new organizer, Stave.

strike or abandon its role as the certified bargaining representative of the employees. N.L.R.B. v. Sunrise Lumber & Trim Corp., 5 Cir., 1957, 241 F.2d 620, certiorari denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34. We are in agreement with the Board.

Since the strike was based on the unfair labor practices of the employer, the employees are entitled to reinstatement with back pay, as the Board ordered. The duty to reinstate with back pay applies to all the striking employees, even though they have been replaced. Mastro Plastics Corp. v. N.L.R.B., 1956, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309; N.L.R.B. v. Sunrise Lumber & Trim Corp., 5 Cir., 1957, 241 F.2d 620, certiorari denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34.

The order of the Board is hereby Enforced.