**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GRIGGS EQUIPMENT, INC., Respondent.**

No. 19016.

United States Court of Appeals
Fifth Circuit.

Aug. 24, 1962.

Rehearing Denied Oct. 30, 1962.

**276**

GEWIN, Circuit Judge.

This case is before this Court upon a petition of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. A. § 160(e), for enforcement of its order issued against respondent, Griggs Equipment, Inc., on December 23, 1959. The respondent manufactures school, church and theatre seating equipment in Belton, Texas, and is engaged in interstate commerce.

During the summer of 1958, the Union [1] engaged in a campaign to organize respondent's work force of about 400 employees. At that time respondent employed about 100 temporary employees to supplement its regular complement of about 300. This was the respondent's annual practice to meet the increased seasonal demand for its products. There is an abrupt decline in production in September when the schools open and a layoff of these temporary employees is necessary. About September 1, Superintendent Frank Elliott called Mill Foreman Albert Copeland into his office and said, "the union was trying to organize and we was going to have to be on the watchout for it". Elliott also informed Copeland that J. L. Richards was going from "house to house to the employees to sign them up in the union"; that "Ray Trail was working for the union"; and that "Dayton Lee was working for the union"; and "had an office out at his home".

Early in September, Elliott called employee Troy Richards into his office and according to Richard's testimony told him that there was "some union activity going around, some cards around the plant", and asked "if I know who was passing them out, and began to explain to me what it would do to the Company, that they would cut hours and bonus and so on". Elliott further stated that if he knew the identity of those who had cards, he would "talk to them and might get them to break a loose from it". On September 5, respondent sent a letter to each

Standau E. Weinbrecht, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., for petitioner.

Alto B. Cervin, Dallas, Tex., Byron Skelton, Temple, Tex., Lee Curtis, Belton, Tex., for respondent Griggs Equipment, Inc.

Before RIVES, CAMERON and GEWIN, Circuit Judges.

1. United Brotherhood of Carpenters and Joiners, AFL–CIO.

of its employees at his home referring to the union's organizing efforts and setting forth reasons why "your Company is very much opposed to any outside interference. * * *".

Employee E. Henry Karl signed a union card in July 1958, and during the course of the organizing drive secured signed authorization cards from 72 of respondent's employees. Karl's union activities were commented on by his co-workers. His foreman, Bill Tyrock, accused him of being "the one that was passing cards around". Karl denied this activity. Several weeks later, Karl told Boyd Waters, Superintendent of Plant No. 1, and Louis Richardson, Vice-President in Charge of Production, of his conversation with Tyrock in an effort to assure them of his loyalty to the company. However, Waters asked Karl if he had changed his mind concerning the Union, informing him that "the office" had received information that Karl was going around to the employees' homes to sign them up. Karl again denied such actions.

Karl was employed by respondent as an arc welder for ten years, even though he was handicapped by a short leg which caused him to walk with a limp and made it necessary for him to sit down while working. During his ten years of work for respondent, Karl had never been laid off in one of the seasonal reductions in force, and his work as an arc welder had never been criticized by his supervisors. Although the layoff in 1958 was no more severe than usual, Karl was laid off in the middle of his shift on September 11 by his Foreman, Tyrock. At the time he laid Karl off, Tyrock stated he was unable to give a reason for the action. However, he later told him that it was because he (Karl) was considered to be the one who had broken into the candy machines in the plant, an incident which had occurred some 8 or 9 months previously. At the time of Karl's layoff, there was still arc welding work being done, and three men with less seniority than Karl were retained. Two months after his layoff, there were five men on the payroll classified as arc welders, all of whom had less service with respondent than Karl.

Dayton Lee was the leadman on the night shift in respondent's glue room where he had worked for six years without a layoff. Lee was active on behalf of the union, having obtained authorization cards from all seven of the glue room employees. When Lee reported for work on September 28, he found the glue room had been cleaned up by the day shift and was informed there would be no night shift. He was assigned by Foreman Hamilton to temporary work. While Lee was working, Hamilton brought his check to him and laid him off before the end of the shift; telling him that his glue room job "didn't exist anymore". Three glue room employees with less service and experience than Lee were retained by respondent and production in that department was resumed two days after Lee's layoff.

Upon the foregoing facts, the Board found that respondent, by threatening and interrogating its employees regarding their union activities, violated § 8 (a) (1) of the Act, 29 U.S.C.A. § 158(a) (1). The Board also found that respondent laid off E. Henry Karl and Dayton Lee because of their activities on behalf of the Union, thereby violating § 8(a) (3) and (1) of the Act.

The Board order requires respondent to cease and desist from the unfair labor practices found, and from, in any other manner, interfering with, restraining or coercing its employees in the exercise of their statutory rights. Affirmatively, the order requires respondent to reinstate Lee and Karl with backpay and to post appropriate notices.

 Viewed with the background of the many cases in this circuit and in others, we are obliged to uphold the Board's cease and desist order and enforce the same. As was stated in N. L. R. B. v. Fox Manufacturing Co. (5 Cir., 1956), 238 F.2d 211:

"Nevertheless, if there is substantial evidence on the record taken as a whole which permits the inference

that questioning of job applicants and employees as to their attitude towards the union and that comments that unionization will cause a reduction in hours and that union activity might cost a man his job amount to threats or coercion, then we may not substitute our judgment for the Board's in reviewing its finding that these acts showed a purpose to interfere with the employees' rights in violation of Section 8(a), (1) of the Act, 29 U.S.C.A. § 158(a) (1). N.L.R.B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567; N.L.R.B. v. McGahey, 5 Cir., 233 F.2d 406; N. L.R.B. v. Newton Co., 5 Cir., 236 F. 2d 438."

Also the Board properly concluded that Waters' interrogation of E. Henry Karl, as to whether he had changed his mind about the union, was a violation of § 8(a) (1) of the Act. Stokely Foods, Inc. v. N.L.R.B. (5 Cir., 1952), 193 F.2d 736; N.L.R.B. v. Cen-Tennil Cotton Gin Company (5 Cir., 1952), 193 F.2d 502. The statements in and of themselves might possibly be lawful and non-coercive, but viewed in its entirety, there is sufficient evidence of a background of union hostility in context with the statements made to bring them within the proscription of § 8(a)(1) of the Act. See Blue Flash Express, Inc., 109 N.L.R.B. 591.

 There is substantial evidence to support the Board's finding that the respondent violated § 8(a)(3) and (1) of the Act by discriminatorily laying off employee E. Henry Karl. At first, his foreman did not tell Karl the reason for his layoff, which alone would be enough to support an inference that the layoff was discriminatory. N.L.R.B. v. Dell (5 Cir., 1960), 283 F.2d 733; N.L.R.B. v. S. S. Coachman & Sons (5 Cir., 1953), 203 F.2d 109. The reasons finally brought forth for the dismissal are insufficient to show that Karl was fired for cause. The first reason presented by respondent is that Karl broke into some candy machines eight months previously. It is reasonable to assume that the company would have discharged him at or near the time of the incident, instead of waiting until the union movement began to discharge him for that reason. N.L. R.B. v. East Texas Steel Castings Co. (5 Cir., 1954), 211 F.2d 813. It was also claimed that Karl was not versatile in his employment due to his physical handicap. Karl's handicap had never interfered with his versatility on the job prior to this time and he had been on the job as an arc welder for ten years. The record further indicates that there had been layoffs as severe as the one in 1958, but Karl had never been put out of work. As stated, when Karl was fired, three arc welders with less seniority were retained, and thereafter two more were hired. This is inconsistent with the allegation that the slack season precipitated the layoff.

Likewise, there is substantial evidence in the record which supports the Board's findings that the layoff of Dayton Lee was discriminatorily motivated. Lee, like Karl, was active in the union movement and had enjoyed uninterrupted employment with the respondent for many years. The reason given Lee for his dismissal was that his glue room job had been abolished. The evidence, however, shows that the glue room operation is indispensable to respondent's production and that it resumed operation two days after Lee's layoff. In the context of respondent's anti-union animus and its knowledge of the Union, the inference drawn by the Board of discriminatory motivation is sustained and is buttressed by the fact that the explanation of the layoffs failed to stand under scrutiny. N.L.R.B. v. Bird Machine Co. (1 Cir., 1947), 161 F.2d 589; N.L.R.B. v. Dant, (9 Cir., 1953) 207 F.2d 165. It follows that by discharging Lee, respondent violated § 8(a) (3) and (1) of the Act unless, as respondent contends, Lee was a supervisor within the meaning of § 2 (11), 29 U.S.C.A. § 152(11) and therefore not within the Act's protection.

A supervisor as defined by § 2(11) of the Act is as follows:

" * * * any individual having authority, in the interest of the em-

ployer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not merely of a routine or clerical nature, but requires the use of independent judgment."

Lee was considered so well skilled in the work of the glue department that he served as the respondent's "leadman". In addition to performing the same duties as the other employees in the glue department, Lee "looked after the glue, mixing of the glue, and he kept time on the men that worked in it and also kept a record of the materials that were used". His pay was $1.21 per hour at the time of his layoff. While this was a few more cents per hour than received by some of the other employees in the glue department, it was the same rate as that received by two "trainees" or "set-up" men working under Foreman Stewart. The other foremen working for respondent received approximately $1.60 per hour.

A co-worker testified at the hearing that a Mr. Williams was the foreman of the glue department and not Lee. The work was highly repetitive and routine, and production quotas were set in bales of material per man. Lee was given a regular production quota, although at times he would help another employee with his work or give advice as needed. Although Lee had been told he could "pull the card" of any of the men he worked with, he never exercised this responsibility nor was he given the opportunity to do so. One time Lee suggested that an employee's work was slack and he spoke to the foreman about it. The foreman told Lee that he would lay this employee off, but he did not do so. As stated by Lee in his testimony, "He said that but he fired me and kept him."

In further support of its contention that Lee was a supervisor, respondent asserts that he recommended to Foreman Hamilton that Ray Trail be hired for work in the glue room and that Trail was thereafter employed. On cross-examination however, Hamilton conceded he hired Trail before speaking to Lee about him and when he asked Lee about Trail, Lee said: "I don't know anything about him."

It is a question of fact in every case as to whether the individual is merely a superior worker who exercises the control of a skilled worker over less capable employees, or is a supervisor who shares the power of management. As stated in N.L.R.B. v. Southern Bleachery & Print Works, Inc. (4 Cir., 1958), 257 F.2d 235:

> "It is equally clear, however, that the employer cannot make a supervisor out of a rank and file employee simply by giving him the title and theoretical power to perform one or more of the enumerated supervisory functions. The important thing is the possession and exercise of actual supervisory duties and authority and not the formal title."

We conclude that Lee never exercised such authority as to bring him within the term "supervisor" as defined in the Act. This Court has held that "leadmen" and others below the rank of foremen fall outside the statutory definition, pointing out that the legislative history of the Act discloses a purpose to distinguish between such employees and "supervisor[s] vested with such genuine management prerogatives". Poultry Enterprises, Inc. v. N.L.R.B. (5 Cir., 1954), 216 F.2d 798.

Lee was discharged on September 26, 1958, and the hearing in the instant case was held on March 11 and 12, 1959. On July 13, 1959, a representation hearing was held, pursuant to a petition filed by the Union for an election. One of the issues to be decided in the latter case was whether ten leadmen then employed by respondent were "supervisors". The Board found on the basis of the evidence adduced at that representation hearing that the leadmen then under consideration were supervisors and ordered them excluded from the voting unit. While re-

spondent admits that this later ruling is not controlling, it asserts that the ruling is entitled to persuasive relevance. This question was decided in N.L.R.B. v. Southern Airways Co. (5 Cir., 1961), 290 F.2d 519. That case held that one decision is not necessarily controlling on the other when "based on the facts as they existed at two different times, several months apart". In the instant case, the hearing in the representation proceeding concerned facts as they existed in July 1959; whereas, the unfair labor practices here involved evidence in September 1958, ten months earlier. We hold that on the basis of the evidence presented in the case before us, the finding that Lee was not a supervisor within the meaning of the Act is correct.

A decree enforcing the decision and order of the Board will be entered.