**NATIONAL LABOR RELATIONS BOARD**
**v. FISHER GOVERNOR CO.**

No. 13575.

Circuit Court of Appeals, Eighth Circuit.

Nov. 5, 1947.

Clarence A. Meter, Atty., National Labor Relations Board, of Minneapolis, Minn. (A. Norman Somers, Asst. Gen. Counsel, and Dominick L. Manoli and Thomas B. Sweeney, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

H. G. Cartwright, of Marshalltown, Iowa (Boardman, Cartwright & Druker, of Marshalltown, Iowa, on the brief), for respondent.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued against Fisher Governor Company, respondent, requiring respondent to cease and desist from certain labor practices found by the Board to be unfair, and offer reinstatement with back pay to certain discharged employees. The order issued in a proceeding initiated by the Board's complaint based on charges filed by the International Association of Machinists. The complaint charged respondent with violation of Section 8 (1) and Section 8 (3) of the National Labor Relations Act, 29 U.S. C.A. § 158(1, 3), in that it discharged its employees Howard Milburn and Leroy H. Schwechel and since said discharges has refused and failed to reinstate said employees to their former or substantially equivalent positions of employment, the discharges being for the reason that said employees joined and assisted the International Association of Machinists, and engaged in concerted activities with other employees, for the purpose of collective bargaining and other aid and protection. The complaint also charged respondent with making statements to its employees disparaging and expressing disapproval of the union and advising and urging its employees to refrain from assisting, becoming members of, or remaining members of the union, these statements being alleged to be of a coercive character. As the Board found in favor of the respondent as to this charge, we shall make no further reference to it.

In its answer respondent admitted that it had discharged the named employees but specifically denied that they were discharged "for reasons other than the violation of rules and regulations duly promulgated by the respondent." The Board, after hearing, made findings sustaining the charge of discriminatory discharges of the named employees and on its findings entered the order which it now seeks to have enforced.

Respondent is an Iowa corporation with its principal place of business in Marshall-

914

town, Iowa, and for a number of years has been engaged in the manufacture, sale and distribution of automatic regulating devices for air, gas, steam, oil and other fluids. It is admitted that respondent is and has been engaged in interstate commerce. Respondent resists the enforcement of the order on the ground that there is not sufficient nor substantial evidence to support the findings that it violated Section 8 (1) or Section 8 (3) of the Act. The International Association of Machinists had for some years prior to the initiation of the proceedings culminating in the order now under consideration, been attempting to organize respondent's employees and at the time of the discharge of the employees in question the union was actively engaged in attempting to secure sufficient membership to entitle it to recognition as the representative of the employees for the purpose of collective bargaining.

 As the Board found that the discharges were discriminatory and because of the union activities of the discharged employees, the question presented to us is whether the Board's findings on this issue are supported by substantial competent evidence. It is not our province to weigh the evidence nor to consider the credibility of the witnesses, nor to substitute our views as to the facts for those of the Board as we are not a fact-finding body, but our inquiry must be limited to ascertaining whether there is substantial competent evidence to sustain the charge found true by the Board. N.L.R.B. v. Cape County Milling Co., 8 Cir., 140 F.2d 543, 152 A.L.R. 144.

It appears from the evidence that Milburn and Schwechel were employees of long standing and of unquestioned efficiency. They were very active members of the union. Both were dismissed the same day immediately following soliciting a fellow employee to join the union. Schwechel had been continuously employed by respondent for twelve years and during that time had been promoted periodically and at the time of his discharge he was being paid $1 per hour, which was the highest rate of pay in his department. He was fifth in point of seniority among approximately sixty-eight fellow employees in his department. He was, as above noted, very active in behalf of the union and attended most of its meetings which were being held with increasing frequency between September, 1945, and March, 1946. He distributed to fellow employees many union membership application cards immediately preceding his discharge. On March 1, 1946, while at work, he observed an employee named Olman, during the latter's lunch hour, talking to an employee named Elmer Hoadley, whose machine was about twenty-five feet from Schwechel's machine. He went to Hoadley's machine and asked Olman to "come up to my machine. I want to speak to you," and a few minutes later Olman stopped at Schwechel's machine and in the course of a conversation lasting not more than one or two minutes, Schwechel asked Olman to join the union, which invitation Olman declined and returned to work. The following morning, March 2, respondent's vice president instructed Olman to report to his office and there questioned him whether Schwechel had solicited him to join the union. Olman answered in the affirmative. On the same morning Schwechel had left the plant with respondent's permission to transact some personal business and on his return found that his time card had been removed from the rack. He then reported to the personnel director, inquiring why his card had been removed and was advised that he had been soliciting during working hours between 12:30 and 12:40 on the previous day. He was peremptorily discharged and given his pay check which had been previously made out. Schwechel left the plant with Milburn who had also been discharged at the same time, and later he and Milburn called upon respondent's vice president. Both of these employees were assured by the vice president and the personnel director that their work records were satisfactory but they were being fired "as examples to show that they would fire good men as well as bad" for violating plant rules. A few days later respondent sent to Schwechel, in response to his request for a letter of introduction, two letters stating in substance that his work had been satisfactory and that respondent had the highest regard for his honesty and integrity.

Milburn had been in respondent's employ five years at the time of his discharge on March 2, 1946, and at that time he was employed as a multiple drill operator, receiving 95¢ an hour, the highest rate paid by respondent for workers in his classification. There were employed in his department approximately forty-five employees and he ranked seventh or eighth in seniority among this group. He joined the union in September, 1945, and became openly active in its behalf, attending practically all of its meetings, distributing application cards, and discussing unionization with his fellow employees at every available opportunity. His union activities increased noticeably during the period immediately preceding his discharge because during that period the union believed it had secured almost enough members to petition the board for an election to determine its status as bargaining agent. The following circumstances leading up to his discharge may be noted.

On February 28, 1946, upon the completion of his shift which ended at 4:00 p. m., he stopped on his way out of the plant at the machine of employee Presnall "two or three minutes, or a minute or so". Presnall, whose shift began at 4:00 p. m., had not yet started operating her machine. Milburn returned to his tool box and a few minutes later again stopped at this machine and asked Presnall if she had filled out the application card, to which she replied that she had not and Milburn then offered to fill it out for her but she refused and he took the card and left the plant. There was evidence that this incident "just took long enough to say that," perhaps less or "about a minute." On the following day, March 1st, foreman Buchanan told Presnall that he had been called to the office on a report that she had distributed union cards. Presnall denied distributing cards, but when asked the name of the person distributing the union cards she declined to give it and the next day the superintendent phoned her at her home and asked her to report to his office. She reported shortly thereafter and was taken to the vice president's office for an interview which lasted for more than half an hour, during which time the vice

president and the personnel director and the superintendent were present. She was told that respondent's rules prohibited solicitation for the union and was asked as to Milburn soliciting her on February 28 to join the union. Presnall related what had taken place when Milburn had solicited her to join the union on February 28. On March 2, Milburn was summoned to the personnel director's office and was informed that his employment was about to be terminated. He was assured that his work had been satisfactory but that he had violated respondent's rule against union solicitation. He was then handed his pay check which had been previously prepared. Milburn returned to his machine and inquired of the foreman whether there had been anything wrong with his work and whether the foreman had turned in a report against him, to which the foreman replied, "Absolutely not."

Respondent's personnel director testified that the primary and immediate reason prompting the discharge of Schwechel and Milburn was that in soliciting Olman and Presnall to join the union they had violated the plant's rule prohibiting employees from soliciting union membership. This was referred to as the "overt act" that had led to the dismissal of these employees, but that in addition these employees had repeatedly left their machines and engaged in an excessive amount of visiting at the plant contrary to respondent's rule, and it is respondent's contention that the discharges were a part of the effort of respondent's managing officers to increase its production and to discourage employees from absenting themselves from their work and from visiting among themselves during working hours. There was substantial evidence indicating that during the latter part of the year 1945 and the early part of 1946, a marked decline in its production had occurred and that respondent was attempting not only to ascertain the cause of this decline in its production, but to find a remedy for it. There was posted at the plant a notice addressed to its employees, dated January 14, 1946, reading as follows:

"It is Community War Chest time again. We are all invited to participate in the

current campaign which has opened today. The Red Cross drive will come in March.

"Your management believes both these national charitable institutions are worthy of our wholehearted support and you will all have the opportunity of contributing to them in our usual way—through the Personnel Department. It is entirely up to each individual how much should be given.

"Marshalltown is expected to raise $45,-300.00 as its share of Marshall County's quota. This is the same figure we met last year. There are seven local agencies and eighteen War Chest agencies to be supported.

"Your attention is again called to the rule that no other solicitations are sanctioned or permitted in the shop and violations are subject to discharge."

There was also posted the following notice addressed to employees:

"An occasional collection of money in a department or plant-wide is often a real gesture of sympathy and good intent. However, continuous solicitation, friendly as it may be, has created too many embarrassing situations among our employees.

"It is henceforth the policy of this company that no funds for reasons or groups other than recognized charities shall be collected or solicited within the plant.

"Permission to solicit for public charities such as Red Cross or Community Chest may be granted to the extent of distributing pledge cards."

It is admitted that respondent had a rule prohibiting its employees from leaving their machines to engage in visiting or conversation with one another, but this rule was never reduced to writing nor posted in the plant. The Board was of the view that the rule prohibiting solicitation was not broad enough to cover solicitations for union membership and it is apparent that both of the printed notices seem to refer only to the solicitation of funds and may well have been so understood by the employees. So far as the rule against visiting is concerned, the Board found that while there was such an unwritten rule it seems to have been a very flexible one so far as its enforcement was concerned.

According to the testimony of respondent's personnel director and superintendent, employees were permitted to engage in a "reasonable amount" of visiting at the plant, such as "three or four minutes," and it appears without dispute that many of respondent's employees had been in the habit of leaving their machines and visiting with their fellow employees.

It is to be noted too that when these men were discharged the reason assigned for their discharge was not excessive visiting or inefficiency, but because they had solicited union membership in the plant in violation of respondent's rule against solicitation. The investigation made immediately preceding their discharge went to the question of whether or not they had violated the non-solicitation rule by soliciting membership in the union during working hours, and not to the rule against excessive visiting. A further circumstance noted by the Board is that there was no proof that Schwechel and Milburn engaged in a greater amount of visiting than other employees, nor does it appear that their conduct preceding their discharge was violative of the rule against excessive visiting. It is significant too that other employees who were not members of the union had to respondent's knowledge persistently engaged in visiting at the plant. The only discipline administered to any others, with one exception, was a reprimand. In fact, at the very time that Schwachel invited Olman to join the union, the latter had been visiting with another employee for a longer period of time than he conversed with Schwachel. The Board found, and we think the evidence warranted the finding, that there was a disparity in the treatment of Schwachel and Milburn and other employees who engaged in the same infractions of respondent's rule. There had been, prior to the discharge of Schwachel and Milburn, but one man discharged for excessive visiting, but he had been warned by the personnel director "on an average of once a month" against excessive visiting and prior to his discharge he had even been given a written warning, and, incidentally, he was a member of the union.

The fact that one member of the Board wrote a dissenting opinion is stressed by

respondent, but it is observed that even in this opinion it is stated that:

"The record does not convince me that either Schwachel or Milburn was discriminatorily discharged. There is substantial evidence to support my colleague's conclusion that they were, and I would be the last to say that reasonable men could not reach that result."

As has already been observed, the question before the Board was whether or not this charge was sustained by a preponderance of the evidence. This involved a weighing of the evidence and a determination of the credibility of the witnesses. The question before us, however, is a very narrow one: Is the finding of the Board sustained by substantial competent evidence? Being of the view that there is substantial competent evidence sustaining this finding, the order will be enforced.