**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KALOF PULP & PAPER CORPORATION et al., Respondents.**

**No. 16903.**

United States Court of Appeals Ninth Circuit.

April 3, 1961.

14. It is expressly stated in these terms. See note 8, supra.

448

———◆———

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer and William J. Avrutis, Attys., N.L.R.B., for petitioner.

Max Bernbaum, Beverly Hills, Cal., and Gordon B. Severance, Monterey Park, Cal., for respondent Company.

Warren Woods and Wilson, Woods & Villalon, Washington, D. C., for respondent unions.

Before BARNES, HAMLEY and MERRILL, Circuit Judges.

MERRILL, Circuit Judge.

This case is before us upon the petition of the National Labor Relations Board to enforce its order issued against respondents on May 1, 1958, pursuant to § 10(c) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C. § 151 et seq. The Board's decision and order are reported at 120 N.L.R.B. 714.

The Board found that respondent Company discriminatorily discharged four employees at the instance of respondent Union, thereby respectively violating §§ 8(a) (3) and (1) and 8(b) (2) and (1) (A) of the Act. The Board found that the Union further had violated § 8(b) (1) (A) by promising these employees benefits and threatening them with reprisals in order to induce them to stop their activities on behalf of a rival labor organization. The Board's order in brief required respondents to cease and desist from further discriminatory action of the kind charged. The Company was required to offer the four employees reinstatement to their former or substantially similar positions. Respondents jointly were required to make the employees whole for loss of pay suffered. The petition for enforcement is opposed by both the Company and the Union.

The sole question presented by these proceedings is whether the record provides adequate support for the findings of the trial examiner which were adopted by the Board. Respondents contend that the Board and the examiner failed to take into consideration certain material undisputed facts; that the Board's decision was therefore not based upon the record considered as a whole within the meaning of § 10(e); that the burden of proof resting upon the general counsel was not met and that the petition for enforcement must accordingly be denied.

There is no question but that the employees were fired. The question is as to the motive for their discharge. The Company asserts that they were fired for reasons of economy. The trial examiner refused to accept this explanation and, relying upon inference, found that the men were fired due to their determination to withdraw from the Union and affiliate with a rival labor organization. The Board adopted the findings of the examiner.

The men, who were employed at the company plant at Port Hueneme, California, were fired January 19, 1957. The Union, at the time, under contract with the Company was the exclusive bargaining representative of the employees at the plant. The four men involved were employed in the plant's boiler room and were classified as shift engineers and oilers, being paid $2.55 an hour. They became dissatisfied with their wages and working conditions and expressed their dissatisfaction at union meetings. Nothing came of their complaints and, believing that they were not being adequately represented, they decided to withdraw from the Union and affiliate with a different organization. They signed and delivered to the other organization cards designating it as their representative.

The chain of management at the plant from the top ran as follows: the Manager, the Plant Superintendent, the Plant Engineer, the Chief Steam Plant Engineer. The last named officer was the immediate superior of the four employees with whom we are concerned. He learned of the men's actions with reference to the Union and this information filtered its way upward. The Plant Superintendent expressed to the men the Company's wish that the Union continue as sole employee representative. He stated to the Plant Engineer his intention of getting the Union's International Representative to come down and talk to the men and straighten the matter out. A few days later, on January 17, the International Representative arrived to attend a meeting of the local union and install its new officers. He testified that no one had told him about the problem of the shift engineers prior to his arrival. He had two talks with the shift engineers, one on the seventeenth and one on the eighteenth. There is dispute as to just what was said. The shift engineers testified that on the second occasion the International Representative had told them that he could get them $2.63 an hour if they would stay with the Union and that they would either accept that or lose their jobs. They had stated that they still wished the other organization to represent them. The representative had then said: "Well, all is fair in love and war and this is war. I will have your jobs." The following day, through the Chief Steam Plant Engineer, the men were fired. They were told that they had been hired on a temporary basis for construction work; that plant construction had been completed and that they were being let go for that reason.

The Company contends that the men's union dispute had nothing to do with their being fired and that the fact that the two events occurred at the same time was pure coincidence. The Company presented testimony to the effect that it was then in financial straits; that the plant was not operating efficiently and that there had just been a change in management; that the new Manager just a few days earlier had expressed his dissatisfaction with the plant maintenance and his resolve to cut expenses in this area; that specifically he had expressed the intention of eliminating the jobs of the shift engineers and passing their duties on to other plant personnel; that this was in fact done after the men were discharged; that these men were not the only ones to be discharged as a result of management changes at this period; that the Plant Engineer had also been discharged. The Company and the Union both emphasize that there is no testimony that the International Representative actually was contacted by the Company prior to his arrival at the plant; or that the Company had requested him to intervene; or that the Company had authorized him to offer $2.63 an hour (the International Representative himself denied this); or that the Company had in fact fired the men for union reasons.

The testimony was most carefully weighed by the trial examiner in his report. The testimony of each witness was separately discussed. As to the disputed points, the report states:

"On those points, I credit the testimony of the employees, because (1) the men impressed me as honest and reliable witnesses, and (2) their testimony is corroborated in general by the testimony of * * * [the Plant Engineer] and * * * [a union representative], and (3) their testimony is consistent with the undisputed evidence and the undisputed sequence of events.

"I was also favorably impressed by * * * [the Plant Engineer] as a witness. He was the only Company official, directly concerned with the events of the controversy, who testified, and he did so in a fair and forthright manner. While his testimony may be subject to a suspicion of bias, because of his own discharge by the Company, I could perceive no bias or rancor in that witness. To all appearances, he had no personal interest in the proceeding, and testified in an honest and candid manner."

The only witness called by the Company was the man who had served as the owner's personal representative at the time of the incidents in question. Most of the other management personnel had at the time of the hearing left the Company. The Manager who had ordered the men discharged had himself been discharged. The Superintendent was unavailable due to illness. The examiner's appraisal of the Company's testimony was as follows:

"During the period prior to the discharges, Grant was a personal representative of the owner of the plant, but he had no responsibility for any part of the plant operations. Apparently, his duty was to observe the operation of the plant and to report to * * * [the owner]. His testimony gave the impression of being an improvisation, a substitute, for the testimony of the Company's supervisors who actually participated in the events which led up to the discharge of the four shift engineers, but who were unavailable as witnesses, because of their illness or of prior discharge by the Company. There were points upon which Grant had no knowledge, and much of his testimony was a recital of what the absent officials said, when they took certain action. At the hearing, the undersigned was apprised of these circumstances, which explained the absence of the management officials, and permitted the Company wide latitude in developing the testimony of Grant. However, the testimony of Grant was not impressive. It seemed to lack that convincing quality which springs from firsthand knowledge of the events, and their forthright narration."

It is clear that the examiner simply disbelieved the explanation advanced by the Company. His report states:

"A consideration of the testimony leads to the conclusion that the Company's defense—as exemplified by * * * [the Chief Steam Plant Engineer's] speech to each employee at the time of discharge, and the Company's answer—that the men were hired for construction work which had come to an end, is simply untrue. The testimony of * * * [the Plant Engineer] establishes that the construction workers were hired pursuant to a contract with the Ventura Building Trades Council, and that the construction workers were terminated at the time the plant began the manufacture of paper, and that subsequently the shift engineers were hired to perform duties in the boiler room, connected with the manufacturing process."

The examiner concluded:

"All the evidence in this case establishes that the Company and the * * * [Union] had established a relationship mutually satisfactory, and that both parties were determined that it would not be disturbed, even if its continuance meant the commission of unfair labor practices."

The Board in its decision pointed to another aspect of the case: the contract between the Company and the Union had contained a union security clause which had been enforced by the Company and the Union, although compliance with § 9(f) (g) and (h) of the Act was not achieved until February 9, 1957, shortly before these incidents. The Board concluded:

"On these facts, we agree with the Trial Examiner that there is more involved here than coincidence. The rapid sequence of interlocking events establishes to our satisfaction that Company and Union were acting in concert. Moreover, we note that this conduct is precisely that contemplated in the contract between Company and Union, which we, like the Trial Examiner, have found to be violative of the Act. Accordingly, in finding that the Union violated Section 8(b) (2) by causing the Company to discriminate unlawfully against these employees we rely upon: (1) the reasonable inference

that the Union, in fact, brought about such discrimination in view of \* \* \* [the International Representative's] threat to these employees that they would lose their jobs coupled with the immediate fulfillment of that threat; and (2) the existence of an illegal contract between the Union and Company requiring discrimination of the type that actually occurred in this case."

In these proceedings the Board asserts that it was justified in disbelieving and rejecting the Company's explanation for the firing of the men and in accepting the conclusions of the trial examiner for the following reasons:

(1) The rapid sequence of interlocking events which the Board regarded as more than mere coincidence;

(2) The fact that the discharge was consistent with a contract clause violative of the Act;

(3) Evidence of prior mutually satisfactory relationship between the Union and the Company and testimony to the effect that upon the hiring of these men their affiliation with the Union had been stated to be necessary; that management had expressed distress over their plans to withdraw;

(4) The false explanation given for their discharge at the time it took place;

(5) Failure of the Company to call the Chief Steam Plant Engineer as a witness although he was available for testimony at the time of hearing and was the only representative of management who could have cast light on the situation by virtue of his direct knowledge of the events.

Upon the record we conclude that the trial examiner, faced with problems of credibility, was entitled to disbelieve the Company's explanation and for the reasons emphasized by the Board was entitled to draw the inference that the discharges were founded on discrimination. The Board, we hold, was justified in its findings and in its decision.

Decree will be entered enforcing the order as prayed.