STERLING ALUMINUM COMPANY, a
Division of Federal-Mogul, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 18829.

United States Court of Appeals
Eighth Circuit.

Feb. 29, 1968.

James S. Newberry, of O'Herin & Newberry, Malden, Mo., for petitioner.

Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John E. Nevins, Atty., N.L.R.B., Washington, D. C., on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The Sterling Aluminum Company, a division of Federal-Mogul, petitions this Court to review an order of the National Labor Relations Board. Reported at 163 NLRB 40, March 9, 1967, 64 LRRM 1354. The Board requests that its order be enforced.[1] This Court has jurisdiction under Section 10(e) and (f) of the National Labor Relations Act. 29 U.S.C. § 160(e), (f) (1964 ed.).

The Company, a manufacturer of automobile pistons, transferred its operations from St. Charles to Malden, Missouri, and began production in March, 1963. The International Molders and Allied Workers Union of North America, AFL–CIO, who represented the employees at St. Charles, followed the Company to Malden, and instituted an organizational campaign July 12, 1964. It made rapid progress and filed a representation petition with the Board on July 27th (Case No. 14–RC–4904). The Company conducted a vigorous campaign against Union representation, which resulted in the Union losing the N.L.R.B. supervised election on September 17th. The Union filed objections to the election and unfair labor practice charges.

The General Counsel, after an investigation of the charges, issued a complaint alleging that the employer had violated Section 8(a) (1) and (3) of the Act. 29 U.S.C. § 158(a) (1), (3) (1964 ed.).

The Trial Examiner concluded that the Company violated Section 8(a) (1) of the Act by threatening reprisals, promising and granting benefits, coercively interrogating employees, subjecting Union supporters to ridicule, engaging in and creating the impression of surveillance, inducing and encouraging employees to report on the Union activities of fellow employees, threatening to bargain in bad faith, creating grievance committees to discourage Union membership, and other related acts of unlawful interference. He also concluded that the Company discharged eleven Union adherents prior to the election to rid itself of the most active unionists and to thin the ranks of Union supporters and, thereafter, in anticipation of another election, discharged seventeen additional employees and refused to rehire one more. He held the twenty-eight dis-

---

1. Two earlier matters involving the labor relations of this Company have been decided by this Court. Woody v. Sterling Aluminum Products, Inc., 365 F.2d 448 (8th Cir. 1966), cert. denied, 386 U.S. 957, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1967) (rehearing denied); Brown v. Sterling Aluminum Products Corporation, 365 F.2d 651 (8th Cir. 1966), cert. denied, 386 U.S. 957, 87 S.Ct. 1023, 18 L.Ed.2d 105 (1967) (rehearing denied).

charges and the one refusal to rehire violated Section 8(a) (3) and (1) of the Act.[2] The Board, with minor modifications not material here, adopted the recommendations of the Trial Examiner.

The Company does not contest the Board's findings and conclusions that the Company violated Section 8(a) (1) of the Act. It asks, however, that its findings and conclusions respecting the discharges and the refusal to rehire be reversed. It contends that the General Counsel failed to sustain its burden of proving that the twenty-nine employees were discharged because of their Union activities, or that it was motivated to discharge them by a desire to interfere with their rights under the Act. It urges that there was a lack of substantial evidence to establish that: it had knowledge of the fact that the discharged employees were members of the Union; it had no legitimate business reasons for discharging the employees; the reasons advanced by it for the discharges were mere pretenses.

The standards to be applied in reviewing decisions of the N.L.R.B. are well recognized. E.g., Universal Camera Corp. v. National L. R. Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Superior Sales, Inc., 366 F.2d 229 (8th Cir. 1966); N. L. R. B. v. Coachman's Inn, 357 F.2d 134 (8th Cir. 1966); N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534 (8th Cir. 1963). We apply them here.

In determining whether there is substantial evidence on the whole record to support the findings of the Board that the Company discriminated against twenty-nine employees by discharge or refusal to rehire, it will be convenient to divide them into five groups. Group 1(A) consists of five employees laid off on July 10, 1964, and discharged on August 19, and 1(B) consists of five employees laid off on July 31, 1964, and

also discharged on August 19. Group 2 consists of four employees discharged on December 4, 1964, and a fifth employee whose layoff resulted from the discharge of the four. Group 3 consists of four employees laid off on February 3, 1965, and subsequently discharged. Group 4 consists of four employees discharged in February of 1965. Group 5 consists of the remaining employees.

### GROUP 1

On July 10, 1964, two days before the Union initiated its organizational campaign, the Company laid off thirty-six employees for economic reasons. On July 31st, it laid off an additional ten employees. A few days later, the Company began the recall of the laid off employees and, within a short time, had recalled all but fourteen of the forty-six. The fourteen were notified by the Company, on August 19, 1964, that their work was unsatisfactory, and that their temporary layoff should be considered permanent. Ten of the fourteen had signed Union cards. It is this ten with which we are concerned.

We turn first to a consideration of Bob Batchelor, Acy Lee Green, Teddy Guffey, Larry Walton and David Midkiff. They were among the thirty-six employees laid off on July 10th, and discharged on August 19th. We have carefully examined the record relating to them and find that there is substantial evidence to support the findings of the Board that the discharge of Batchelor, Green and Midkiff was discriminatory and in violation of Section 8(a) (3). The essential "ingredients" of such findings are a knowledge on the part of the employer that the employee is engaged in Union activity and the discharge of the employee because of this activity. N. L. R. B. v. Melrose Processing Co., 351 F.2d 693, 697 (8th Cir. 1965).

There was direct testimony to support a finding that the Company knew that Batchelor was a Union adherent and suf-

---

2. The Company was found not to have violated the Act by terminating six other employees. Complaints as to the discriminatory discharges of two other employees were withdrawn.

ficient circumstantial evidence to justify an inference that the Company had similar knowledge as to Green and Midkiff. The Company carried on a widespread systematic interrogation to determine where each employee stood on the Union question. Its supervisors admitted that they had a good idea as to who the Union adherents were (although, in a few instances, their ideas were wrong). Malden is a small community and many of its leaders were involved in the campaign. N. L. R. B. v. Melrose Processing Co., supra; A. P. Green Fire Brick Company v. N. L. R. B., 326 F.2d 910 (8th Cir. 1964). The Union made no secret of its organizational campaign. It solicited authorization cards in and around the plant building and held its meetings in the meeting room of the Catholic Church, where persons attending could be readily observed coming and going. Employees favorable to the Company indicated where their sympathies lay.

■■■ We believe that the record, as a whole, supports the Board's conclusion that Batchelor, Green and Midkiff were discharged for Union activity rather than for a cause or causes unrelated to such activity. While there is conflict in the testimony, it is not for us to displace the Board's choice between two fairly conflicting views of the evidence, even though we might have made a different choice of inferences had the matter been before us. N. L. R. B. v. Coachman's Inn, supra; N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., supra.

Batchelor was allegedly discharged for absenteeism and poor work but had not been reprimanded for either prior to his layoff.

Green was allegedly discharged · for "running bad pistons" but had been transferred out of the department in which the pistons were made prior to this layoff. His services in the new department were satisfactory.

Midkiff was allegedly discharged for improper inspection of pistons but had not been warned that his work was unsatisfactory despite a custom to give each employee a written notice to this effect.

■■ We do not believe, however, that the record supports the Board's findings that the discharges of Guffey and Walton were discriminatory. The Board's determination that the Company knew they were Union members and discharged them for that reason was based entirely on circumstantial evidence. While this is permissible and while the Board is free to draw reasonable inferences from the evidence, N. L. R. B. v. Melrose Processing Co., supra; Kitty Clover, Inc. v. National Labor Relations Board, 208 F.2d 212 (8th Cir. 1953), such inferences must be adequately supported in the record. Otherwise, as Judge Sanborn indicated in Cupples Co. Manufacturers v. National Labor R. Board, 106 F.2d 100, 117 (8th Cir. 1939), the findings of the Board may represent nothing more than accurate guesses.

■■ It is clear that the Company was hostile to the Union, and that it was seriously interfering with the rights of employees at or about the time of the discharges. It was also reasonable for the Board to infer that the Company knew that Guffey and Walton were Union members. We recognize that each of these facts give some support to the inference that the discharges were discriminatory, N. L. R. B. v. Superior Sales, Inc., supra; N. L. R. B. v. Melrose Processing Co., supra; N. L. R. B. v. Council Manufacturing Corporation, 334 F.2d 161 (8th Cir. 1964); N. L. R. B. v. Arkansas-Louisiana Gas Co., 333 F.2d 790 (8th Cir. 1964), but they do not, in our view, support it sufficiently: (1) The July 10th layoff was admittedly non-discriminatory in nature. (2) The Company had a good reason for discharging Guffey and Walton.[3] Compare, N. L. R. B. v. Byrds Manufacturing Corpora-

---

3. Guffey was absent without excuse eight times in three months; three times in April, once in May and four times in June. He was given a final warning on June 26th, that further absences would lead to his discharge. Notwithstanding

tion, 324 F.2d 329 (8th Cir. 1963). (3) Three other employees, none of whom were Union adherents, were also discharged for absenteeism on the same date. Cf., National Labor Relations Board v. Fisher Governor Co., 163 F.2d 913 (8th Cir. 1947). (4) There was no evidence that any of the six employees discharged for absenteeism were subsequently replaced. (5) While the Company may have had reasonable cause for believing that Guffey and Walton were Union adherents, there was no indication in the record that they were among the leaders or were active in the organizational drive.

We turn now to a consideration of the five employees laid off on July 31st and discharged on August 19, 1964, namely: Glendle Elsworth, John P. Battles, Earl Thurston, Ether Lee Coats and Rodney Proffer.

We have carefully reviewed the record relating to them and find that there is substantial evidence to support the Board's conclusion that their discharges were discriminatory. In our view, the Board's statement with respect to the five is well taken.

"Not only had * * * [they] been passed over in the first, clearly non-discriminatory, layoff, but they were thereafter laid off just four days after the petition for an election was filed, and only a very short time before Respondent actually began calling back employees from the first layoff, in which these five had not originally been included. If it is assumed, as Respondent apparently contends, that its least desirable employees were laid off first, some explanation would seem to be in order for recalling earlier laid off employees, while terminating those who had originally been retained. No reason appears. Finally, notwith-

standing, the contention that the five employees laid off on July 31 were selected by the divisional superintendents, the evidence shows that certainly three, including two of the foremost Union adherents [Battles and Elsworth], were picked out by higher management."

Not only was there direct testimony indicating that the Company was aware of the fact that Battles and Elsworth were leaders in the drive for Union recognition, but there is a lack of testimony to support the Company's contention that they were discharged for cause. The incidents relied upon by the Company to establish that Battles had a poor work record occurred after he had been selected as one of the employees to be laid off, and were not demonstrated to have been of a substantial nature. While the Company advanced reasons for discharging Elsworth, the record indicates that he was, in fact, considered to be a good employee doing an essential job.

The Company knew that Proffer was a Union adherent, and had good reason to believe that Coats was, as he was a close friend and constant companion of Elsworth. The Board was, for the reasons previously stated, justified in concluding that the Company was also aware of Thurston's Union membership.

The Company advanced reasons for the discharge of all three. It contended that Proffer had a record of excessive absenteeism, that Coats failed to "produce enough," and that Thurston had provoked an argument with a supervisor and was not a valuable employee. While there is some merit to the Company's position as to each employee, we cannot say that the Board did not reach a permissible conclusion with respect to them. Proffer was not given a final warning as to his absenteeism, and had been com-

---

this fact, he was absent without excuse on July 10th, the date on which the layoff occurred.

Walton also had a substantial record of absenteeism. He was first employed in February, 1964. From then until July 26th, he was absent for approximately

twenty-six days, or nearly twenty per cent of the time. While the record indicates that these absences may have been related to difficulty with his legs, caused by having to stand on the concrete floor while at work, it is clear that they affected his value as an employee.

plimented by a supervisor as doing "a darn good job;" Coats was never shown the disciplinary report indicating he was not meeting his production quota, and denied having been reprimanded for the alleged deficiency; and Thurston had been complimented on his work, and denied provoking an argument with his supervisor.

### GROUP 2

Larry Golden, Harold Gough, Lloyd Evans and Gary Burrow were discharged on December 4, 1964, and Frankie Rice was laid off as a result of the discharges.[4]

The Company testified that it discharged the four because they failed to meet a production standard of $1.75 per hour.

A review of the record indicates: that the four employees had not been advised of the $1.75 standard; that the home office of the Company, rather than local supervisors, determined those not meeting the standard; that the other nine employees discharged on December 4th were not members of the Union; that no employees earning less than $1.75 per hour were retained on the payroll; and that replacements were hired for the discharged employees.[5]

The Trial Examiner, whose findings were adopted by the Board, discussed the evidence and concluded:

"The termination of the employees * * * shows a pattern of elimination of employees of fairly long service, with no warning, no previously

stated dissatisfaction with the quantity or quality of their work, carried out with an attitude of obvious reluctance on the part of the immediate supervisors most concerned, or asserted mystification as to the reason for the termination of these employees. In the circumstances * * *, the inference [is] compelling that these terminations constitute only another facet in Respondent's campaign to dilute, if not wipe out, the adherents of the Union among the employees.

"* * * [I]t strains credibility that administrative officers, far removed from the production scene, would make quite serious decisions about production personnel, on a large scale, without consulting the production supervision directly affected, if in fact, 'production' was the basis for the decisions being made. * * *"

■■ While the decision of the Company to weed out the "thirteen least efficient" employees without consultation with their immediate supervisor and without advising the employees that the $1.75 per hour standard existed was unfair to the employees and of questionable benefit to the Company, we do not feel that it is reasonable to infer that the Company discharged thirteen employees to eliminate four Union adherents.[6] The record of the Company before and after December 4th indicated that it knew who the Union adherents were and that it had no hesitancy in finding a "reason" for eliminating them. If the Company had discharged four non-Union em-

---

4. Rice was recalled to work in five weeks. It is conceded that he is entitled to receive back pay for the period of his layoff if, in fact, the four employees were discharged in violation of the Act, and that he is not if we reach a contrary result.

5. There is a conflict in the testimony as to whether the replacements met the production standard of $1.75 per hour. The Trial Examiner, whose report was adopted by the Board, stated:

"Furthermore, it is clear that the decision to terminate all of these employees as a group and replace them with new employees, had a serious im-

mediate effect on Respondent's production, * * *.

"Schoemehl [a supervisor] testified * * * that after the replacement of the terminated employees, production improved. Again, no records were submitted in support of this assertion. Such meager evidence as adduced by General Counsel from records supplied by Respondent casts some doubt on the assertion. * * *"

6. We note that the Board did not require that the non-Union employees be reinstated, nor does it indicate its reason for not doing so.

ployees to provide a cover for the elimination of nine Union adherents, the inference made by the Board might well be permissible. But, in this situation, particularly where none of the four were active in the organizational effort and only two (Evans and Burrow) were identified as being known Union adherents by direct testimony, the inference in our view is not a reasonable one.[7] Cf., National Labor Relations Bd. v. Shedd-Brown Mfg. Co., 213 F.2d 163 (7th Cir. 1954); National Labor Relations Board v. Dinion Coil Co., 201 F.2d 484 (2d Cir. 1952); National Labor Relations Board v. Sifers, 171 F.2d 63 (10th Cir. 1948).

The Board cites, Sheffer Corp. v. N. L. R. B., 380 F.2d 1007 (6th Cir. 1967); N. L. R. B. v. Tidelands Marine Service, Inc., 338 F.2d 44 (5th Cir. 1964); Wonder State Manufacturing Company v. N. L. R. B., 331 F.2d 737 (6th Cir. 1964); National Labor Relations Board v. Williams, 195 F.2d 669 (4th Cir.), cert. denied, 344 U.S. 834, 73 S.Ct. 42, 97 L. Ed. 649 (1952); National Labor Relations Board v. National Garment Co., 166 F.2d 233 (8th Cir.), cert. denied, 334 U.S. 845, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948), to support its view that it was permissible for the Board to infer that non-Union employees were discharged to lend credence to the discharge of Union adherents. We do not believe that the cases cited are authority for drawing the inference here.

In *Sheffer,* the employer discontinued an entire night shift of twenty-seven employees when the Union showed strength on that shift, asserting that the shift was uneconomic. Subsequently, all but four were rehired, and these four, the subject of the proceeding, were known by the Company to be Union adherents. The Court directed the reinstatement of the four.

In *Tidelands Marine Service,* a crew of thirteen was laid off and not rehired, the asserted reason being that they had failed to advise the Company as to how they could be recalled. Three of the crew were subsequently put to work, but most never worked for the Company again. The crew included two of the most active Union organizers, and most of the crew had signed Union pledge cards. The Board stated, "The employer knew of the Union membership of most, if not all, of the crew. * * * He clearly did know some were Union men and he had reason to believe that others were as well." Here again, there is no indication that the entire crew was fired to reach a few known Union adherents among the thirteen; but rather that the entire crew was fired because the employer felt that most, if not all, were active supporters of the Union.

7. While at least one Court has stated that an inference drawn by an administrative agency may only be upset if it is "hopelessly incredible" or "flatly contradicts either a so-called 'law of nature' or undisputed documentary testimony," National Labor Relations Board v. Dinion Coil Co., 201 F.2d 484, 490 (2d Cir. 1952), this Court has held the test to be one of reasonableness:

"Where either one of two inferences may reasonably be drawn from undisputed facts, the inference adopted by the agency or board whose duty it is to draw the inference from which it is to formulate its judgment may not be disturbed on appeal. Radio Officers' Union v. N. L. R. B., [etc.,] 1954, 347 U.S. 17, 48–49, 74 S.Ct. 323, 98 L.Ed. 455; Corn Products Refining Co. v. F. T. C., 1945, 324 U.S. 726, 739, 742,

65 S.Ct. 961, 89 L.Ed. 1320; N. L. R. B. v. Nevada Consolidated Copper Corp., 1942, 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305; N. L. R. B. v. Des Moines Foods, Inc., 8 Cir., 1961, 296 F.2d 285, 289. See discussion in 4 Davis, Administrative Law Treatise, § 29.05."

Northwest Bancorporation v. Board of Governors, Etc., 303 F.2d 832, 840 (8th Cir. 1962) (cited in Davis, Administrative Law § 29.05). Accord, Williams v. Celebrezze, 243 F.Supp. 103 (E.D.Ark. 1965).

We note that one test of the reasonableness of the inference is the disproportionate discharge of Union and non-Union employees. See, National Labor Relations Board v. Sifers, 171 F.2d 63, 65–66 (10th Cir. 1948).

In *Wonder State,* two employees worked together in the Company's shipping department. One of them was the known leader in the Union movement. He held a meeting at his home and his fellow employee was among those attending. Two days later, both were discharged, the asserted reason being their continued carelessness. The Court directed the reinstatement of both.

In *Williams,* two employees—one of whom was an active supporter of the Union—were discharged, the asserted reason being lack of work. The Court directed the reinstatement of both.

And, in *National Garment,* all of the employees performing similar work in the plant were laid off allegedly for a bottleneck in production. The day before the layoff occurred, the employer made a speech to all employees in which he threatened to close the plant before dealing with the Union. The Board found that the real reason for the layoff was to implement the threat of the previous day.

Of the five cases cited to support the Board's position, only two, *Wonder State* and *Williams,* involved a situation in which a non-Union employee was discharged to cover the discharge of a known Union adherent. And, in each case, the facts supporting the inference that the charges were discriminatory were, for obvious reasons, stronger than here.

### GROUP 3

Gale Hodges, George Rose, Clarence Nettleton and Andrew Loafman were laid off on February 3, 1965. They were told to return to work the following Monday, at which time other inspectors would be laid off, indicating that a work sharing program was intended. On Saturday, however, the four received notice that due to unforeseen circumstances, their layoff had been indefinitely extended. Two or three weeks later, Hodges, Nettleton and Loafman were notified that their separation from employment was considered to be permanent as of February 4, 1965. On March 25th, Rose was notified that his work record had been evaluated, found to be unsatisfactory, and that he was, therefore, terminated. All four were members of and active in the Union. There was direct testimony that the Company knew that Hodges, Rose and Loafman were Union adherents, and it can be reasonably inferred that the Company had similar knowledge as to Nettleton. All four employees were replaced.

The Company contended before the Board that: Hodges was discharged for excessive tardiness and low production; Rose was discharged for his "poor inspections;" Nettleton was discharged for poor inspections and inadequate production; and Loafman was discharged for a number of minor delinquencies. It did not renew its arguments in its brief or in oral argument.

■ We have reviewed the record carefully and find that there is substantial evidence to support the Board's conclusion that the discharges were discriminatory. These conclusions were based on the Board's findings, amply supported by the record, that the employees were satisfactory to excellent employees, that their original layoff was for economic reasons, that they were never advised as to the reason for their discharge, and that the reasons advanced by the Company at the hearing were mere pretences. See, N. L. R. B. v. Melrose Processing Co., supra; N. L. R. B. v. Plant City Steel Corporation, 331 F.2d 511 (5th Cir. 1964); N. L. R. B. v. Griggs Equipment, Inc., 307 F.2d 275 (5th Cir. 1962); N. L. R. B. v. Dell, 283 F.2d 733 (5th Cir. 1960) (subsequent proceedings reported at 309 F.2d 867 [5th Cir. 1962]).

### GROUP 4

■ D. W. McMillian, Billy Joe Walker, William Wages and Herman Wayne McElrath were each replaced by an employee transferred to Malden from a Company plant in another community. McMillian, Wages and McElrath were superior or satisfactory employees. Although there is a conflict in the testimony, the Board's finding that Walker

was satisfactory is supported by substantial evidence. Walker, Wages and McElrath were senior employees in their department. McMillian was a junior employee in his department, but his replacement left the job a few weeks after filling it and McMillian was not offered his old position.

The Company knew that McMillian, Walker and Wages were Union adherents. Its knowledge as to McElrath's adherency could reasonably be inferred from the circumstances.

There was no evidence of a Company practice relating to the transfer of employees from one plant to another. The Company had, in fact, refused employment to some of its former St. Charles employees and committed itself to employing its non-supervisory employees from the Malden area in return for which the community furnished certain facilities. Under such circumstances, little, if any, weight can be given to the Company's argument that it was merely exercising its discretion in transferring the employees into the Malden plant.

In our view, the findings of the Board that:

" * * * [I]t is obvious that every effort was made to exclude these men from further employment, even against the efforts of their immediate supervisors to retain them or have them transferred to other jobs. In the cases of Walker, Wages and McElrath, these men were let go while junior employees were retained. In McMillian's case, the determination not to further employ him is shown by Respondent's failure to even offer him his old job when it became vacant soon after his layoff. Each of these men were adherents of the Union. Wages and McMillian being notably active in its behalf. * * * "

are supported by substantial evidence, as is the Board's conclusion, that the employees were discriminatorily discharged.

### GROUP 5

■ The Board's conclusion that Jimmy Rose, John Moore and John Barney were not discharged for cause is supported by substantial evidence. They were active in the Union organizational campaign, and were members of the Union. There is direct testimony indicating that the Company was aware of their Union adherency and activity. While the Company advanced a reason for the discharge of each of the employees, the Board found that they were all considered by the Company to be good employees, and that they began to get into difficulties with the employer only after they became active in the Union.

The Company's asserted reason for discharging Jimmy Rose was that he had failed to notify the Company that he was unable to work because of an injury to his hand within the three-day time limit established by the Company for such notice. The undisputed evidence indicated that Rose's wife had, in fact, called the Company on the third day and informed it of her husband's injury and inability to return to work.

■ John Moore had, in fact, been considered one of the Company's top employees and had been permitted to transfer to improve his position in the Company. After the organizing campaign began, he was involuntarily transferred to another department. When he protested, he was told by a supervisor that he had been picked as one of the Union instigators. A supervisor admitted that the Company was seeking to build a record against Moore. While it is clear that he did not succeed in the department to which he had been involuntarily transferred, he was not reconsidered for re-transfer to a department in which he had done good work.[8]

8. An inference of discrimination may be drawn from the Company's failure to consider whether it had other work for this employee. A. P. Green Fire Brick Company v. N. L. R. B., 326 F.2d 910 (8th Cir. 1964); N. L. R. B. v. Byrds Manufacturing Corporation, 324 F.2d 329 (8th Cir. 1963); N. L. R. B. v. Des Moines Foods, Inc., 296 F.2d 285 (8th Cir. 1961).

The Company asserted that it discharged John Barney for falsifying his production records on one occasion. On the day he was discharged, he was called into the Superintendent's office and told that there was no way he could have produced the number of pistons reported on the previous day. He attempted to explain how he was able to produce the number claimed, but was discharged without being given an opportunity to do so. In the light of the refusal of the Company to permit the employee to give his explanation and in view of the Company's inability to reproduce at the hearing the computation that it claims required Barney's discharge, the Board's conclusion that Barney was discriminatorily discharged is sustained. See, N. L. R. B. v. Baker Hotel of Dallas, Inc., 311 F.2d 528 (5th Cir. 1963); N. L. R. B. v. Avondale Mills, 242 F.2d 669 (5th Cir. 1957), aff'd, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958).

Joseph A. Butler, a handicapped employee, was laid off on October 25, 1965. He was informed that the layoff resulted from a lack of work for him to perform. The Company, however, promptly replaced Butler with another employee. The Company admitted at the hearing that he had, in fact, been discharged because he was unable to do his job without assistance from other employees.

The record indicates that the Company had direct knowledge of the fact that Butler was a Union adherent; that his work had been considered satisfactory until the time he became a member of the Union; and that the Company had a policy of hiring and retaining handicapped workers.

 The Company's policy of hiring handicapped workers is certainly a commendable one, and one that ought not to be discouraged by requiring it to maintain a handicapped worker in its employment when it has been adequately demonstrated that he cannot perform the duties for which he was employed. On the other hand, we cannot permit an employee's handicapped condition to serve as a cover

for a discriminatory discharge. We believe that the Board's finding that Butler's discharge was discriminatory is substantially supported by the record. He was hired on February 4, 1964, and worked without complaint until October 25th. While he admittedly had some difficulty in performing his work, there is no indication that it was substantial or unexpected, or that it was greater after July 27th, the date on which he signed a Union card, than it had been before that date. The fact that a false reason was given Butler at the time of his discharge is additional evidence of discrimination. N. L. R. B. v. Kalof Pulp & Paper Corporation, 290 F.2d 447 (9th Cir. 1961); National Labor Relations Bd. v. S. S. Coachmen and Sons, 203 F.2d 109 (5th Cir. 1953); National Labor Relations Board v. Fisher Governor Co., supra.

Kenneth Harris was hired in March of 1963, in the warehouse, and remained there for nearly two years. At that time, he was transferred to the maintenance department. Thereafter, the Plant Manager asked him to work in the "A-Turn" department for a few weeks to see how he liked it, promising to shift him to another job Harris had asked for when an opening arose. Harris worked on the A-Turn machines for about one and one-half weeks. On February 26, 1965, he was asked, just before quitting time, whether he would work the following day, a Saturday. He stated that he would. Fifteen minutes later, the supervisor returned and told him that he had been discharged on instructions from "higher up." Harris later received notification that he was terminated because his production had not met the Company's standards. While there is no direct evidence in the record that Harris was known by the Company to be a Union adherent, the inference that he was is strong as he had been questioned about it by an employee who had been asked to obtain this type of information and report it to the Warehouse Superintendent. The Company contended at the Board hearing that Harris was fired because he failed to meet a standard of 2,000

pieces a day on the A-Turn machines. The only testimony supporting this contention was that of the Plant Manager, who had testified in a pre-hearing deposition that he did not know Harris.

We believe that the facts adequately support the Board's finding that Harris was discharged for Union activities. His discharge is clearly distinguishable from those of Golden, Gough, Evans and Burrow. Indeed, it emphasizes the fact that the Company could and would discharge Union adherents with pinpoint accuracy and without bothering to cover their discharge by discharging non-Union employees simultaneously.

■ Terry H. Butler was hired in October of 1962. He joined the Union and served as one of two observers for the Union at the Board election. He quit his job in November of 1964. In January of 1965, he approached the Plant Manager and asked about coming back to work. The Plant Manager advised Butler that he would check into the matter. He later advised Butler that the Personnel Manager "didn't want to hire [him] because [he] worked pretty hard for the Union and also that perhaps the Union could come up with an election again and [he] would still be for the Union." The Company does not seriously challenge these findings, but contends that Butler was required to see and be rejected by the Personnel Manager before a violation can be found. We agree with the Board that this is not the law. An employee need not follow the letter of an employer's hiring procedure where the circumstances make it clear that a rebuff would result. N. L. R. B. v. Valley Die Cast Corporation, 303 F.2d 64 (6th Cir. 1962); Piasecki Aircraft Corporation v. N. L. R. B., 280 F.2d 575 (3rd Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961); N. L. R. B. v. Stewart, 207 F.2d 8 (5th Cir. 1953).

## SUMMARY

There is substantial evidence to support the Board's decision that Bob Batchelor, Acy Lee Green, David Midkiff, Glendle Elsworth, John P. Battles, Earl Thurston, Ether Lee Coats, Rodney Proffer, Gale Hodges, George Rose, Clarence Nettleton, Andrew Loafman, D. W. McMillian, Billy Joe Walker, William Wages, Herman Wayne McElrath, Jimmy Rose, John Moore, John Barney, Joseph A. Butler, and Kenneth Harris were discharged in violation of the Act; and to support a similar decision with respect to the Company's refusal to rehire Terry H. Butler.

There is not substantial evidence, however, to support its decision that Teddy Guffey, Larry Walton, Larry Golden, Harold Gough, Lloyd Evans and Gary Burrow were discharged, or Frankie Rice laid off, in violation of the Act.

This matter is remanded to the National Labor Relations Board for action consistent with this opinion.